1

2                    UNITED STATES DISTRICT COURT

3                  SOUTHERN DISTRICT OF CALIFORNIA

4    NUVASIVE, INC, a Delaware          Case No.:  13cv2077 BTM(RBB)
     corporation,
5                                       **ORDER GRANTING IN PART
                          Plaintiff,    AND DENYING IN PART
6                                       CROSS-MOTIONS FOR
     vs.                                SUMMARY JUDGMENT**
7
     MADSEN MEDICAL, INC., a            **[To be filed with access
8    Nevada corporation; KRIS           restricted to case participants
     MADSEN, an individual residing in  only until ordered otherwise]**
9    Nevada; and DOES 1-10,
     inclusive,
10
                          Defendants.
11

12   MADSEN MEDICAL, INC., a
     Nevada corporation,
13
                          Counterclaimant,
14
     vs.
15
     NUVASIVE, INC., a Delaware
16   corporation,

17                        Counterdefendant.

18

19        Defendants Kris Madsen and Madsen Medical, Inc. ("MMI") (collectively

20   "Defendants"), have filed a motion for partial summary judgment.  Plaintiff and

                                      1

Counterdefendant NuVasive, Inc. ("NuVasive"), has also filed a motion for partial summary judgment.  For the reasons set forth below, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**, and Nuvasive's motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. FACTUAL BACKGROUND

This action arises out of a soured business relationship between NuVasive on the one hand, and MMI and Kris Madsen on the other.

NuVasive manufactures medical devices for use in spine surgeries.  MMI, a company founded by Kris Madsen, distributes medical devices.  MMI began distributing NuVasive devices in 2004.  In January 2011, NuVasive and MMI entered into an Exclusive Sales Representative Agreement.  ("ESR Agreement" – Pl. Ex. A in Support of Opp. to MSJ.)  Under the ESR Agreement, MMI became NuVasive's  exclusive sales representative in certain territories within Nevada, Arizona, Utah, and California.

The ESR Agreement provides that it will remain in effect for three years unless terminated earlier as allowed under the agreement.  Section 11 of the Agreement sets forth the circumstances under which the ESR Agreement can be terminated.  Section 11.3 provides that NuVasive has the right to terminate the Agreement at will if MMI is deemed to be in "Poor Standing."  As defined in § 6.1,

"Poor Standing" occurs when (1) MMI fails to secure orders for 95% of its aggregate Quota Commitment in any two consecutive calendar quarters, or (2) fails to secure orders for 95% of its aggregate Quota Commitment for any given year.

It is not disputed that MMI fell short of its sales quota in 2011 (87% of aggregate Quota Commitment) and also failed to reach 95% of its aggregate Quota Commitment for the first two quarters in 2012. On August 31, 2012, NuVasive gave notice to Kris Madsen and MMI that it was terminating MMI's distributorship effective immediately. (Ex. Q in Support of NuVasive's MSJ.)

As soon as MMI was terminated, NuVasive hired almost all of MMI's personnel, including MMI's sales representatives, both of MMI's inventory control specialists, and MMI's administrative assistants. Kris Madsen and her sister were not hired by NuVasive.

The parties disagree on the motives behind NuVasive's termination of MMI and dispute whether NuVasive was contractually authorized to solicit and hire MMI's employees after the termination. NuVasive claims that as a result of payment to MMI of $1,756,876, the "Stated Percentage" set forth in § 11.6 of the ESR Agreement, NuVasive obtained the right to solicit and hire MMI's employees. Nuvasive further claims that MMI and Ms. Madsen engaged in wrongdoing after the termination, including failure to return or pay for inventory,

1    making threats and false and disparaging statements about NuVasive and MMI's

2    former employees, and disclosing confidential information of NuVasive.

3         Defendants disagree with NuVasive's interpretation of the ESR Agreement

4    and accuse NuVasive of tortious conduct in connection with what they believe

5    was a plot to cut Ms. Madsen out of the distribution chain and steal MMI's

6    employees and business.   MMI also claims that NuVasive has failed to pay MMI

7    earned commissions.

8

9                              **II. <u>DISCUSSION</u>**

10   A. <u>Defendants' Motion for Partial Summary Judgment</u>

11        Defendants move for summary judgment on NuVasive's first (conversion),

12   second (common count), third (breach of contract), fifth (breach of contract –

13   nondisclosure agreement), sixth (unfair competition), seventh (breach of contract

14   – change of control), eighth (breach of covenant of good faith and fair dealing),

15   ninth (intentional interference with contractual relations – ESR Agreement), and

16   tenth (intentional interference with contractual relations – employment

17   agreements) causes of action.  Defendant MMI also moves for partial summary

18   judgment on MMI's fourth cause of action (breach of contract relating to failure to

19   pay commissions) in its Amended Counterclaim.  The Court grants Defendants'

20   motion as to NuVasive's first, second, and third causes of action to the extent

4

1  that they are based on allegedly missing sets, NuVasive's sixth cause of action to

2  the extent it is based on alleged threats and disparagement by Defendants, as

3  well as Nuvasive's seventh, eighth, ninth, and tenth causes of action.

4  Defendants' motion for partial summary judgment is otherwise denied.

5

6      1.   Claims Based on Missing Inventory

7      NuVasive's claims for conversion (first cause of action), common count

8  (second cause of action), and breach of contract (third cause of action) are

9  based on allegations that after the ESR Agreement was terminated, MMI failed to

10  return inventory to NuVasive.  The inventory at issue consisted of (1) "sets" of

11  medical instruments and implants used in spine surgeries; and (2) "disposables,"

12  such as needles and endotracheal tubes that are used during surgery and then

13  thrown away.

14      With respect to the allegedly missing sets, Defendants move for summary

15  judgment on the ground that NuVasive has admitted that 16 of the 23 missing

16  sets were actually in NuVasive's possession all along, and NuVasive cannot

17  prove that the remaining six sets were taken by Defendants.  NuVasive concedes

18  that many of the missing sets have been located and that NuVasive cannot

19  reliably establish that MMI did not return the remaining sets.  Therefore,

20  NuVasive does not oppose Defendants' motion to the extent it seeks judgment

5

1   on NuVasive's claims to recover for the sets.

2       As for the unreturned disposables, Defendants contend that they are

3   entitled to summary judgment because Plaintiff cannot prove that the allegedly

4   missing disposables were taken by Defendants.   NuVasive's MB58 Report

5   reflected the disposables sent to MMI and also showed the items that were used

6   and charged to clients as reflected on "charge sheets" submitted by sales

7   representatives.   (Dep. of Derrick Von Stein (NuVasive Ex. 8) 27:15-31:4.)

8   However, if sales representatives did not record on charge sheets all of the

9   disposables that they had used, then NuVasive would not have any way of

10  knowing that the disposables were used.  (Id. at 31:5-9.)   Other than training,

11  NuVasive did not have any procedure in place to make sure that the sales

12  representatives properly recorded all of the disposables that they used.  (Id. at

13  37:14-18.)

14      Defendants argue that because NuVasive cannot prove that the MB58

15  Report accurately accounts for all of the disposables used in the field, NuVasive

16  cannot prove that the disposables that were not returned and were not charged

17  to clients were kept by Defendants.  However, it is not NuVasive's burden to

18  prove where all of the disposables have gone.  According to the ESR,

19  "Representative understands and agrees that following termination for any

20  reason, Representative will be responsible for returning any outstanding

6

1    inventory items and will be held responsible for missing items." (Nuvasive Ex. A

2    at § 11.1.)

3        It appears that MMI did not have a reliable system in place to track the use

4    of disposables.  According to Jerrold Tsuneta, former inventory manager of MMI,

5    the disposables were kept in boxes in a closet in MMI's offices, and MMI's sales

6    personnel were free to take the items whenever they wanted.  (Tsuneta Dep.

7    (NuVasive Ex. 5) 37:23-38:3.)  Sales representatives would keep disposables in

8    their cars.  (Id. at 42:2-22.)  For a short period of time, there was a log on a

9    clipboard that sales personnel were supposed to fill out when taking disposables

10   from the shelves.  (Id. at 45:25-47:20.)  However, sales personnel stopped filling

11   out the log.  (Id. at 46:8-14.)  Tsuneta does not recall any other procedures that

12   were implemented by MMI to track the inventory.  (Id. at 49:10-12.)

13       Based on the evidence before the Court, it seems that MMI did not keep

14   track of the quantity of disposables that each sales representative had in his or

15   her possession.  MMI should have kept records of disposables taken off the

16   shelves by each sales representative and should have held the sales

17   representatives responsible for disposables that they could not account for

18   through charge sheets.  MMI's failure to do so has made it difficult if not

19   impossible for MMI to account for disposables that are not reflected on the

20   charge sheets and are not in MMI's possession.  These disposables are "missing

7

1    items" and are MMI's responsibility under the terms of the ESR Agreement.

2         Defendants argue that the MB58 Report does not reflect disposables used

3    after August 31, 2012, by sales representatives then in the employ of NuVasive.

4    However, it is unclear whether disposables taken from MMI's shelves were used

5    by sales representatives after August 31, 2012.   In his deposition, Tsuneta

6    testified that *presumably* sales representatives were using disposables for

7    procedures over the weekend.   (Tsuneta Dep. (Def.'s Ex. 23) 205:2-4.)   At any

8    rate, as discussed above, if MMI had kept track of disposables in the possession

9    of each sales representative, MMI could have made the sales representatives

10   account for outstanding inventory, whether they were still in the employ of MMI or

11   not.

12        There are triable issues of fact with respect to whether Defendants

13   breached the ESR Agreement by failing to return disposables or pay for missing

14   disposables after MMI's termination.   There are also triable issues precluding

15   summary judgment on NuVasive's claims for conversion and common count.

16        Conversion is "the wrongful exercise of dominion over the property of

17   another" – questions of good faith, lack of knowledge, and motive are immaterial.

18   Irving Nelkin & Co. v. South Beverly Hills Wilshire Jewelry & Loan, 129 Cal. App.

19   4th 692, 699 (2005) (internal quotation marks and citations omitted).   "It is not

20   necessary that there be manual taking of the property; it is only necessary to

8

1  show an assumption of control or ownership over the property, or that the alleged

2  converter has applied the property to his or her own use."  Messerall v. Fulwider,

3  199 Cal. App. 3d  I324, 1329 (1988) (internal quotation marks and citation

4  omitted).  Even if MMI is not intentionally using the disposables at issue for its

5  own benefit, if MMI cannot return them to NuVasive and cannot account for them,

6  it can fairly be said that MMI has wrongfully exercised dominion over them.

7  Under California law, a common count may be stated "whenever the

8  plaintiff claims a sum of money due, either as an indebtedness in a sum certain,

9  or for the reasonable value of services, goods, etc., furnished."  Kawasho Int'l,

10  U.S.A. Inc. v. Lakewood Pipe Service, Inc., 152 Cal. App. 3d 785, 793 (1983)

11  (internal quotation marks and citation omitted).  NuVasive has presented

12  sufficient evidence that MMI is indebted to NuVasive for the value of the missing

13  disposables.

14  Therefore, Defendants' motion for partial summary judgment is granted as

15  to NuVasive's claims for conversion, common count, and breach of contract to

16  the extent that the claims are based on the allegedly missing sets, but is denied

17  to the extent the claims are based on the missing disposables.

18

19  2.  Claims Based on Alleged Threats and Disparagement

20  The following claims by Nuvasive are based on alleged threats and alleged

9

false and disparaging statements made by Kris Madsen and/or MMI about NuVasive and MMI's former employees:  unfair competition (sixth cause of action),[1] breach of contract (seventh cause of action), breach of covenant of good faith and fair dealing (eighth cause of action), intentional interference with contractual relations – i.e., the ESR Agreement (ninth cause of action), and intentional interference with contractual relations – i.e., the employment agreements between NuVasive and former MMI employees (tenth cause of action).  The Court finds that NuVasive has failed to produce sufficient evidence to create a genuine issue of material fact with respect to its claims that Madsen and/or others acting on behalf of MMI made threats or disparaging statements that caused harm to NuVasive.

NuVasive argues that Defendants have failed to carry their initial burden of production on their motion for partial summary judgment on these claims.  The Court disagrees.  A moving party without the ultimate burden of persuasion at trial may carry its initial burden of production by (1) producing evidence negating an essential element of the nonmoving party's case; or (2) after a sufficient time and opportunity for discovery, by showing that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its

---

[1]  NuVasive's unfair competition claim is based on the alleged threats and disparagement made by Kris Madsen/MMI as well as the alleged disclosure of NuVasive's confidential information.  NuVasive's claims based on the alleged disclosure of confidential information are examined in the next section of this Discussion.

1   ultimate burden of proof at trial.   Nissan Fire & Marine Ins. Co., Ltd. v. Fritz

2   Companies, Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).  "A moving party may not

3   require the nonmoving party to produce evidence supporting its claim or defense

4   simply by saying that the nonmoving party has no such evidence."  Id. at 1105.

5        Defendants do not merely claim that NuVasive lacks evidence of threats

6   or disparaging statements made by Ms. Madsen and/or MMI.  Defendants point

7   to the deposition testimony of key witnesses who stated that they were unaware

8   of threatening or disparaging statements made by Ms. Madsen.  (Smith Dep.

9   (Def.'s Ex. 24) 181:8-21; Kordonowy Dep. (Def.'s Ex. 26) 108:6-20; Hannon Dep.

10  (Def.'s Ex. 28) 86:12-89:3.)  Although Frank Orlando stated that he heard from

11  someone that Ms. Madsen made a statement during a meeting regarding his

12  criminal background, Orlando was in the employ of MMI at the time, and the

13  statement was made to NuVasive employees not third parties, so no harm could

14  have been done to NuVasive.  (Orlando Dep. 190:16-191:22.)  Defendants also

15  point out that although Orlando claimed in his deposition that Dr. Bruce Burnett,

16  Ms. Madsen's husband, made threatening statements to him or others, Orlando

17  acknowledged that the statements had no effect on NuVasive's business

18  relationships.  (Orlando Dep. 184:6-17; 185:24-186:2; 187:22-24; 190:7-13.)

19        The Court is satisfied that Defendants have carried their initial burden of

20  production.  Therefore, NuVasive must produce sufficient evidence to create a

1  genuine issue of material fact.  <u>Nissan</u>, 210 F.3d at 1103.  NuVasive has failed to

2  do so.

3        The only evidence against Ms. Madsen is the alleged statement Ms.

4  Madsen made at the sales meeting regarding Orlando's criminal background.

5  However, this evidence is inadmissible hearsay.  Orlando does not remember

6  who told him Ms. Madsen made this statement.   (Orlando Dep. 191:15-22.)

7  Furthermore, as mentioned above, the statement was allegedly made to

8  NuVasive employees while Orlando was employed by MMI.  Therefore, even if

9  Ms. Madsen made such a statement, it would not have interfered with

10  NuVasive's business relationships.

11        The rest of NuVasive's evidence pertains to alleged threatening or

12  disparaging statements made by Dr. Burnett.  (Opp. at 11:22-12:10.)  According

13  to Orlando, Dominic Gonzales told Orlando that an unidentified nurse told him

14  that Dr. Burnett stated to a NuVasive customer, "I can't believe you're working

15  with those criminals."  (Orlando Dep. 186:15-187:10.)  This alleged statement is

16  inadmissible hearsay.

17        The remaining threatening or disparaging statements reported by Orlando

18  consist of vague, passing comments to Orlando and other former MMI

19  employees, along the lines of "You're going down," "You're going to be screwed,"

20  or "You might be lucky to have a job in a few months."  (Orlando Dep. 184:22-

1  186:4, 189:9-190:4, 254:19-256:4.)   Orlando also felt threatened by a comment

2  Dr. Burnett allegedly made about how he liked to go to the gun range and

3  imagine certain people as the targets.   (Orlando Dep. 181:20-183:24.)

4        Even if Dr. Burnett's alleged statements rise to the level of threats or

5  disparagements, NuVasive has not presented any evidence establishing that Dr.

6  Burnett was acting as an agent for MMI or Ms. Madsen when he allegedly made

7  the statements at issue.   See Keys v. Washington Metropolitan Area Transit

8  Auth., 408 F. Supp. 2d 1, 4 (D.D.C. 2005) ("A corporation is only liable for the

9  torts of its employees if those acts are committed within the scope of their

10  employment."); Villa Glas G.M.B.H. v. Everstone Pty. Ltd., 2006 WL 3498163, at

11  *5 (M.D. Fla. Dec. 4, 2006) ("Plaintiff cites no authority for the novel proposition

12  that, absent evidence of corporate authority establishing an actual or apparent

13  agency, a corporation is liable for the personal torts of its shareholders.  Indeed,

14  the law is to the contrary.")  That Dr. Burnett was a shareholder of MMI and was

15  retained by MMI as a consultant and advisor to Ms. Madsen since June 10, 2012,

16  does not establish that Dr. Burnett was acting within the scope of his employment

17  or as an agent for MMI and/or Ms. Madsen when he made the alleged

18  statements.  At most, the evidence shows that Dr. Burnett was angry about the

19  way his wife and MMI had been treated and made some unprofessional

20  comments to the former MMI employees.

Furthermore, NuVasive has failed to raise a genuine issue of material fact with respect to the issue of damages.  Because Orlando previously admitted in his deposition that he had no knowledge of Dr. Burnett's statements interfering with NuVasive's business relationships, NuVasive attempts to establish damages another way.  NuVasive has submitted a declaration of Orlando in which Orlando claims that due to Dr. Burnett's statements, Orlando has chosen to arrange his schedule so that he does not participate in surgeries where Dr. Burnett is the anesthesiologist.  (Orlando Decl. ¶ 4.)  According to Orlando, over the past year and a half, he has spent about 40 hours rescheduling cases and preparing for other NuVasive spine specialists to take his place.  (Id. at ¶ 5.)  Orlando states, "That time was not available for me to spend on other productive tasks for NuVasive."  (Id.)  However, it is unclear whether NuVasive was paying Orlando for the time he spent rearranging his schedule.  If Orlando was not being paid for such time, then NuVasive did not incur any loss.

In his declaration, Orlando also states that because of his level of experience, "I typically provide more input and suggestions to surgeons, resulting in approximately 10 percent more revenue on each case that I handle."  (Orlando Decl. ¶ 6.)  Thus, Orlando reasons, NuVasive earned about $30,000 less in revenue on the 60 to 70 cases where a substitute took his place because he was avoiding Burnett.  (Id.)  However, there is no evidence supporting Orlando's

claim that he earns 10 percent more revenue on each case that he handles.  It is unclear whether Orlando is basing his claim on actual and fair comparisons – i.e., revenue figures from the same type of surgeries with the same doctors – or pure speculation.   Based on the record before the Court, there is no basis for concluding that each time a substitute took Orlando's place at a surgery, the substitute, no matter how seasoned he or she was, failed to make sales of equipment that Orlando otherwise would have made.

NuVasive has failed to produce sufficient evidence to create a genuine issue of material fact on its claims based on alleged threats and disparagement by Madsen and/or MMI.   Therefore, the Court grants Defendants' motion for partial summary judgment on Nuvasive's claims for unfair competition (to the extent that it is based on alleged threats and disparagement), breach of contract, breach of covenant of good faith and fair dealing, intentional interference with contractual relations (ESR Agreement), and intentional interference with contractual relations (employment agreements between NuVasive and former MMI employees).

### 3.   Claims Based on Disclosure of Confidential Information

NuVasive's fifth cause of action for breach of contract and sixth cause of action for unfair competition allege that Defendants improperly disclosed

15

confidential information of NuVasive.  Defendants seek summary judgment on these claims on the ground that NuVasive has no evidence that MMI or Ms. Madsen disclosed NuVasive's confidential information to any third parties at any time or that, even assuming there was a disclosure of confidential information, NuVasive suffered damages.

The Court denies Defendants' motion on these claims because Defendants have not satisfied their initial burden of production.  Defendants present evidence that the reason that MMI was terminated was because of its failure to meet the sales quota.  (Def.'s Mem. of P &A at 21:1-12.)  However, the fact that MMI was terminated for failure to meet the sales quota does not mean that Defendants did not disclose confidential information after the termination.  Defendants do not point to discovery or other materials that demonstrate that NuVasive does not have enough evidence to carry its burden of persuasion at trial.

Similarly, with respect to the issue of damages, Defendants merely state, "NuVasive has no evidence of any damages that it purportedly suffered from that alleged disclosure."  (Def.'s Mem. of P & A at 21:14-15.)  Defendants' statement that NuVasive lacks evidence of damages is not sufficient to carry Defendants' initial burden of production.  Nissan, 210 F.3d at 1105.  Therefore, NuVasive has no obligation to produce any evidence in support of its claims, id. at 1102, and the Court does not reach Defendants' arguments regarding the sufficiency of

NuVasive's evidence.  Defendants' motion is denied as to NuVasive's fifth cause of action for breach of contract and sixth cause of action for unfair competition (to the extent it is based on disclosure of confidential information).

### 4. <u>MMI's Claim for Failure to Pay Commissions</u>

MMI moves for partial summary judgment on its fourth cause of action for breach of the ESR Agreement by failing to pay sales commissions.  It is not disputed that the amount of unpaid commissions totals $38,489.  (Opp. at 14:19-20.)   However, NuVasive contends that partial summary judgment on MMI's claim is inappropriate because NuVasive has pled offset as an affirmative defense.

The right to an equitable offset is based on the principle that "either party to a transaction involving mutual debts and credits can strike a balance, holding himself owing or entitled only to the net difference."  <u>Granberry v. Islay Investments</u>, 9 Cal. 4th 738, 744 (1995) (internal quotation marks and citations omitted).  "It is well settled that a court of equity will compel a set-off when mutual demands are held under such circumstances that one of them should be applied against the other and only the balance recovered."  <u>Harrison v. Adams</u>, 20 Cal.2d 646, 648 (1942).

Because the issue of whether NuVasive is entitled to an equitable offset

1   remains pending, the Court finds that it would be premature to grant judgment on

2   MMI's claim for commissions.   Therefore, the Court denies Defendants' motion

3   as to this claim.

4

5   B.  NuVasive's Motion for Partial Summary Judgment

6        NuVasive moves for partial summary judgment on MMI's first cause of

7   action (intentional interference with business and contractual relationships),

8   second cause of action (breach of contract), third cause of action (intentional

9   interference with prospective economic advantage), fifth cause of action (unfair

10  competition), sixth cause of action (breach of the implied covenant of good faith

11  and fair dealing), and seventh cause of action (unjust enrichment).  The Court

12  grants NuVasive's motion as to MMI's claims for breach of contract and breach of

13  the implied covenant of good faith and fair dealing only.  NuVasive's motion is

14  otherwise denied.

15

16        1.  Breach of Contract

17        In its second cause of action, MMI alleges that NuVasive breached the

18  ESR Agreement, specifically § 11.5(d) of the ESR Agreement, by soliciting,

19  contracting with, and hiring MMI's sales representatives.

20  //

1    Section 11.5(d) provides:

2    If NuVasive should terminate this Agreement due to a material breach
     by Representative of any of their obligations under Section 2.4, 6.13,
3    6.15, 9 or 10 of this Agreement, then in addition to any other legal or
     equitable remedies available to NuVasive, NuVasive shall have the
4    right in its sole discretion and for no additional consideration to
     Representative:   to direct Representative to immediately assign to
5    NuVasive all Compliance Agreements or similar agreements
     described in Section  6.13 above; and to solicit, contract with, or hire
6    any sales representatives of Representative.

7        NuVasive's stated reason for terminating the Agreement was not for breach

8    of MMI's obligations under § 2.4 (conflicts of interest), § 6.13 (agreement

9    regarding competitive products and non-solicitation, § 6.15 (interaction with

10   health care professionals), § 9 (trademarks), or § 10 (confidentiality).   Rather,

11   NuVasive terminated MMI under § 11.3 for being in "Poor Standing."   Section

12   11.3 provides:  "NuVasive shall have the right to terminate this Agreement at will

13   if Representative is deemed to be in 'Poor Standing' per Section 6.1. . . ."

14   Notably, § 11.3 does not say anything about NuVasive having a right to solicit,

15   contract with, or hire sales representatives

16       Defendants contend that § 11.5(d) is the only provision that allows for

17   NuVasive to solicit and hire MMI employees and that, therefore, NuVasive

18   breached the ESR Agreement by soliciting and hiring MMI employees outside of

19   the limited circumstances set forth in § 11.5(d).  The Court disagrees.  Although

20   § 11.3 does not permit solicitation or hiring of MMI employees, it does not prohibit

it either.   The drafters of the contract knew how to expressly permit solicitation and hiring of MMI employees and presumably also knew how to expressly prohibit the practice.   However, they chose not to expressly prohibit the solicitation and hiring of MMI employees.

Furthermore, there is no basis for implying a contractual prohibition.  Under California law, a contract term will be implied only where the term is "indispensable to effectuate the expressed intention of the parties," and the term must be implied "upon grounds of legal necessity."  Ben-Zvi v. Edmar Co., 47 Cal. App. 4th 468, 473 (1995) (internal quotation marks and citations omitted). Contract terms may be implied only if the following conditions are met:

> (1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on grounds of legal necessity; (4) a promise can be implied only where it may be rightfully assumed that it would have been made if attention had been called to it; and (5) there can be no implied covenant where the subject is completely covered by the contract.

Addiego v. Hill, 238 Cal. App. 2d 842, 846-47 (1996).   There is no language in the ESR Agreement that supports implying a *contractual* prohibition against soliciting and hiring MMI employees.  Whether such practices constitute *tortious* conduct is a different question.

NuVasive contends that the terms of the ESR Agreement actually

authorized NuVasive to solicit and hire the MMI employees.  NuVasive points to § 11.6 and § 11.7 of the Agreement.  Section 11.6 pertains to a "Change of Control" of NuVasive and a "Change of Control Payment" that may be owed to the Representative (MMI) in the event  there is a  "Change of Control."  The amount of the "Change of Control Payment" is determined by the "Stated Percentage," defined as 8.75% of all sales generated by the Representative during the most recently-completed fiscal year, to be increased or decreased under specific circumstances set forth in the Agreement.  In connection with a "Change of Control," the Representative is entitled to one half of the "Change of Control Payment" upon closing of the "Change of Control," and the remaining portion ("Second Payment") following exercise of NuVasive or the Acquiring Party to terminate the Agreement under the Change of Control provisions.  If the Representative is in "Poor Standing," the Representative shall be entitled to half of the First Payment and half of the Second Payment.

Section 11.7 provides:

Additional Provisions Regarding Change of Control.  In the event the Second payment is made, all Compliance Agreements (or similar agreements then in effect) shall be immediately assigned to NuVasive or the Acquiring Party (at NuVasive's discretion) and all other reasonable steps (not to include significant cash payments by Representative) shall be taken by Representative to ensure that the services of all Representative Affiliates are continued uninterrupted on behalf of the Acquiring Party of NuVasive (as appropriate). *Further, NuVasive may at any time Representative is in Poor Standing, upon payment of the Stated Percentage, elect to terminate*

*this Agreement and have all Compliance Agreements assigned to it (and require that all other reasonable steps (not to include significant cash payments by Representative) be taken by Representative to ensure that the services of all Representative Affiliates are continued uninterrupted on behalf of NuVasive).*

(Emphasis added.)

The Compliance Agreements are described in § 6.13 of the Agreement. Under § 6.13, MMI represents and warrants that each of its sales personnel has executed a Compliance Agreement, in which the employee agrees, for the term of the Agreement and a period of one year following the expiration of termination of the Agreement, not to (1) develop, promote, or sell competing lines or products in the Territory; (2) solicit any current of former customers of NuVasive to purchase any products or lines that are, in NuVasive's judgment, competitive with the Products covered by the Agreement; or (3) solicit or offer work to any of NuVasive's employees, agents or representatives.  Section 6.13 provides, "each Compliance Agreement will name NuVasive as an intended third party beneficiary with full right to directly enforce provisions necessary to comply with this Section 6.13 . . . ."

According to NuVasive, because it paid, and MMI accepted, the Stated Percentage payment, NuVasive had the right to solicit and hire MMI's employees under §11.7.  MMI argues that § 11.7 does not even apply because it pertains to change-of-control situations only.  The Court is not persuaded by this argument.

Although the section bears the title "Additional Provisions Regarding Change of Control," the pertinent language (the second sentence of §11.7) is not limited to change-of-control circumstances: "*Further*, NuVasive *may at any time* representative is in Poor Standing, upon payment of the Stated Percentage, elect to terminate this Agreement and have all Compliance Agreements assigned to it (and require that all other reasonable steps (not to include significant cash payments by Representative) be taken by Representative to ensure that the services of all Representative Affiliates are continued uninterrupted on behalf of NuVasive)." (Emphasis added.)

Moreover, the first sentence of § 11.7 provides that when the Second Payment (in the event of a Change of Control) is made, all Compliance Agreements shall be immediately assigned to NuVasive and all other reasonable steps taken by Representative to ensure uninterrupted services of all Representative Affiliates.   If the second sentence only applies to change-of-control situations, the second sentence adds nothing to the first sentence and is extraneous.   "Courts must interpret contractual language in a manner which gives force and effect to every provision, and not in a way which renders some clauses nugatory, inoperative or meaningless."   City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 68 Cal. App. 4th 445, 472 (1999).

Although the Court agrees with NuVasive that the second sentence of

1   § 11.7 applies, the Court does not agree that this provision necessarily gave

2   NuVasive the contractual right to solicit and hire MMI's employees.  The express

3   language only gives NuVasive (1) the right to have all Compliance Agreements

4   assigned to it and (2) require that MMI take reasonable steps to ensure that the

5   services of all Representative Affiliates (defined in § 6.13 as MMI's partners,

6   employees, sub-contractors, sales personnel, affiliates or agents) are continued

7   uninterrupted on behalf of Nuvasive.

8        NuVasive argues that § 11.7 must be read as allowing NuVasive to solicit

9   and hire MMI employees upon payment of the Stated Percentage because

10  NuVasive already has the right to enforce the Compliance Agreements as an

11  intended third-party beneficiary.  NuVasive reasons that it would be nonsensical

12  for it to pay over $1.7 million to obtain rights that it already has.  However, it is

13  possible that the parties believed that assignment of the Compliance Agreements

14  would confer some additional benefit on NuVasive.  In addition, it appears that

15  upon payment of the Stated Percentage, NuVasive obtained the right to require

16  MMI to take steps to ensure that the services of MMI's sales personnel continued

17  uninterrupted.  It is unclear what uninterrupted services means in the context of

18  termination – i.e., whether sales representatives must fulfill outstanding

19  contracts, cooperate in transferring business to a new Representative, and/or do

20  something else.  But it seems that NuVasive obtained some sort of benefit that it

would not otherwise have had if it terminated MMI without payment of the Stated Percentage.  Whether the benefit is worth $1.7 million is not for the Court to say. See Frankel v. Board of Dental Examiners, 46 Cal. App. 4th 534, 545 (1996) ("It is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate unjustly.  Parties have the right to make such agreements.")

In sum, based on the record before it, the Court does not find a basis for implying in the ESR Agreement either a prohibition against solicitation and hiring of MMI employees under the circumstances of this case or an authorization to do the same.   Therefore, NuVasive is entitled to summary judgment on MMI's breach of contract claim.


2.  Intentional Interference with Business and Contractual Relationships

MMI's first cause of action alleges that NuVasive intentionally induced breaches of (1) an independent contractor agreement with Matthew Smith's company, Cosmo Medical, Inc., (2) an employment agreement with Frank Orlando, and (3) an employment agreement with Stephen Kordonowy.   MMI alleges:

> Induced by NuVasive, MMI's sales representatives breached their contracts with MMI by, among other things, failing to devote their best efforts to providing services to MMI; failing to maintain MMI's goodwill and reputation; failing to advance MMI's business interests;

breaching their representation and warranty that they are not parties to other employment or non-disclosure agreements that could affect their performance under their contracts with MMI or pose any actual or potential conflicts of interest; failing to abide by their confidentiality obligations; breaching their agreement not to induce or attempt to induce any cutomer, prospective customer, vendor, supplier (including NuVasive), MMI employee, or MMI salesperson to discontinue or limit his or her relationship with MMI during the term of their agreements and for one year thereafter.

(Am. Counterclaim ¶ 37.)

NuVasive argues that to prevail on its claim, MMI is required to show that NuVasive engaged in some independently wrongful conduct. NuVasive further argues that (1) NuVasive was expressly permitted to solicit and hire the MMI employees by the ESR Agreement; and (2) there is no evidence that *prior to the termination* of MMI, NuVasive encouraged MMI's employees to sever their relationship with MMI by promising them employment with NuVasive.

Contrary to NuVasive's assertions, MMI actually does not need to show that NuVasive engaged in wrongful conduct to prevail on its interference with contract claim. In Reeves v. Hanlon, 33 Cal. 4th 1140, 1152-53 (2004), the California Supreme Court held that a defendant is not subject to liability for intentional interference with an at-will employment relationship unless the defendant engaged in an independently wrongful act. That is, "a defendant is not subject to liability for intentional interference if the interference consists merely of extending a job offer that induces an employee to terminate his or her at-will

employment." Id. at 1153.   Here, however, MMI does not complain of just interference with an at-will employment relationship, which is viewed under California law as an interference with a prospective economic advantage.  Id. at 1152.  MMI's claim is premised on the breach of specific contractual terms.

"Because interference with an existing contract receives greater solicitude than does interference with prospective economic advantage, it is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself." Quelimane Co. v. Stewart Title Guaranty Co., 19 Cal. 4th 26, 55 (1998) (internal citation omitted).   The elements of a claim for intentional interference with contractual relations are:  (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. Id.

MMI had valid contracts with Smith, Orlando, and Kordonowy.  NuVasive knew of the contracts and had copies of the contracts.  (Answer to Amended Counterclaim [Doc. 86], ¶ 35.)  Among other things, the contracts prohibit, for a twelve-month period following the employment term, the sales representatives from selling competitive products or otherwise engaging in a competing business in the assigned territories and from soliciting or accepting any business from any

27

1 customer of MMI.  (Exs. 2, 3, & 4 to Madsen Decl., §§ 5.4 and 5.5.)[2]

2      There is a triable issue whether, by hiring Smith, Orlando, and Kordonowy,

3 NuVasive intentionally induced a breach of the contracts.  The tort of intentional

4 interference with performance of a contract "does not require that the actor's

5 primary purpose be disruption of the contract" - it is sufficient if the actor knows

6 that "the interference is certain or substantially certain to occur as a result of his

7 action."  Quelimane, 19 Cal. 4th at 56.  If NuVasive knew about the non-

8 competition and non-solicitation clauses in the contracts, then NuVasive arguably

9 knew that those clauses would be breached if Smith, Orlando, and Kordonowy

10 accepted employment with NuVasive.[3]

11      NuVasive argues that MMI cannot claim that its former employees

12 breached their contracts by working for NuVasive when the ESR Agreement

13 gave NuVasive the right to solicit and hire these same employees and continue

14 its services with them.   However, as discussed above, based on the record

15 before it, the Court cannot conclude that the ESR Agreement authorized

16 NuVasive to solicit and hire MMI employees.  Therefore, NuVasive's motion is

17

18     [2] In its Opposition, MMI alleges breaches of various other provisions of the contracts as well.  However, the Court does not deem it necessary to analyze each of these provisions at this time.

19     [3] Although non-competition and non-solicitation clauses like these would be void as a matter of law under California law (Cal. Bus. & Prof. Code § 16600), such provisions are permitted under Nevada law as long as the restraints on trade are reasonable in scope and

20 duration and supported by valuable consideration.  Camco, Inc. v. Baker, 113 Nev. 512, 518 (1997).  The contracts at issue provide that they are governed by the laws of the State of Nevada.

1   denied as to MMI's intentional interference with contract claim.

2

3       3.  Intentional Interference with Prospective Economic Advantage

4       MMI's third cause of action alleges that MMI interfered with MMI's

5   prospective business relationships with physicians and hospitals by improperly

6   depleting MMI of its personnel.  MMI alleges that but for NuVasive's action,  MMI

7   would have continued selling products to these customers and would have

8   gained future economic benefit from its relationships from these customers.

9       To prevail on a claim for interference with prospective economic

10  advantage, a plaintiff must establish that the defendant engaged in an

11  independently wrongful act.  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.

12  4th 1134, 1158 (2003).  An act "is independently wrongful if it is unlawful, that is,

13  if it is proscribed by some constitutional, statutory, regulatory, common law, or

14  other determinable legal standard."  Id.  at 1159.

15      NuVasive moves for summary judgment on MMI's intentional interference

16  with prospective economic advantage claim on the ground that NuVasive did not

17  engage in independently wrongful conduct.  However, as discussed above, there

18  is a genuine issue of material fact regarding whether NuVasive intentionally

19  interfered with MMI's contracts with its employees.  Intentional disruption of a

20  contract is tortious conduct that would be "independently wrongful."  Accordingly,

1    the Court denies NuVasive's motion as to MMI's third cause of action.

2

3        4.  Unfair Competition

4        In its fifth cause of action, MMI alleges that NuVasive has violated Cal. Bus.

5    & Prof. Code §17200, et seq., by violating various provisions of the ESR

6    Agreement, publicly disparaging MMI, disrupting MMI's relationships with its

7    personnel, interfering with MMI's prospective business relationships with

8    customers, and dismantling MMI's business operations by hiring away its sales

9    representatives.

10       Under the California Unfair Competition Law, "unfair competition" is "any

11   unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code

12   § 17200.   "By proscribing 'any unlawful' business act or practice, the UCL

13   'borrows' rules set out in other laws and makes violations of those rules

14   independently actionable."  Zhang v. Superior Court, 57 Cal. 4th 364, 370 (2013)

15   (internal quotation marks and citations omitted).

16       NuVasive argues that MMI has failed to establish that NuVasive engaged in

17   the type of conduct that would support a § 17200 claim.  But as discussed above,

18   MMI's claims for intentional interference with contract and intentional interference

19   with prospective economic advantage survive summary judgment.  These claims

20   can form the basis of an unlawful practice claim under § 17200.  See CRST Van

30

1  Expedited, Inc. v. Werner Ent., Inc., 479 F.3d 1099, 1107 (9th Cir. 2007) (holding

2  that plaintiff adequately stated UCL claim by alleging that defendant engaged in

3  intentional interference with plaintiff's employment contracts).

4      NuVasive also argues that MMI cannot prove a causal connection between

5  MMI's economic injury and the alleged unfair conduct.  NuVasive reasons that

6  NuVasive's termination of the ESR Agreement and subsequent solicitation and

7  hire of MMI employees was caused by MMI's Poor Standing, not NuVasive's

8  alleged wrongful actions.   Although NuVasive was within its rights in terminating

9  MMI for Poor Standing, MMI's alleged damages are not solely from being

10  terminated.  MMI alleges damages from NuVasive gutting MMI's business by

11  hiring almost all of MMI's employees.  Because there is a triable issue regarding

12  whether NuVasive engaged in tortious conduct by hiring away MMI's employees,

13  there is also a genuine issue of material fact with respect to damages on MMI's

14  UCL claim.

15

16      5.  Breach of Implied Covenant of Good Faith & Fair Dealing

17      MMI's sixth cause of action alleges that NuVasive breached the implied

18  covenant of good faith and fair dealing by depriving MMI of the benefits of the

19  ESR Agreement.  Specifically, MMI claims that NuVasive's communications with

20  and solicitations of MMI's sales force rendered it difficult or impossible for MMI to

31

1  meet its sales quota.  The Court finds that NuVasive is entitled to summary

2  judgment on this claim.

3       MMI offers little more than speculation in support of its conclusion that

4  NuVasive's actions interfered with MMI's ability to reach its sales quota.  The

5  evidence shows that beginning in the Spring of 2012, MMI employees, including

6  Matt Smith, James Pinto, and Steve Kordonowy began complaining to Jeff Moore

7  and Ed Graubert of NuVasive about problems with Kris Madsen's leadership and

8  other employment issues at MMI.  (Smith Dep. (Ex. 1 to Huang Decl.) 146:4-

9  147:22; Pinto Dep. (NuVasive Ex. 9) 37:3-38:3; 43:9-17; 137:10-138:25; 151:7-

10  156:6; Kordonowy Dep. (NuVasive Ex. 4) 36:10-42:13; 46:17-48:22; Moore Dep.

11  (NuVasive Ex. 5) 54:5-56:18; 137:24-140:25; Graubert Dep. (NuVasive Ex. 6)

12  75:2-78:11.)  Clearly, there was a sense of dissatisfaction and unrest among

13  these employees.  MMI fails to show that it was NuVasive's alleged meddling in

14  MMI's affairs as opposed to the underlying employee unhappiness that

15  negatively affected sales.

16       Moreover, even though MMI made the quota for January and February of

17  2012, it is not disputed that MMI fell below 95% of the quota for the first, third,

18  and fourth quarters of 2011.  (Ex. 2 to Expert Report of Elaine E.L. White.)

19  According to MMI, its failure to achieve quota in the second half of 2011 was due

20  to the fact that two key customers decided to stop using NuVasive products.

1   (Madsen Decl. ¶ 10.)   Even if this is so, the fact that MMI failed to make quota

2   before any alleged wrongdoing by NuVasive raises questions regarding

3   causation.  Many factors — e.g., how the quota was determined, the state of the

4   economy, competing products, customer satisfaction, etc., — would have played

5   a role in whether MMI met the sales quota at any given time.

6         Based on the evidence before the Court, the Court cannot conclude that

7   reasonable jurors could find by a preponderance of the evidence that MMI is

8   entitled to a verdict on its claim for breach of the implied covenant of good faith

9   and fair dealing.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)

10  ("Thus, in ruling on a motion for summary judgment, the judge must view the

11  evidence presented through the prism of the substantive evidentiary burden.").

12  Accordingly, the Court grants NuVasive's motion as to this claim.

13

14        6.  Unjust Enrichment

15        MMI's seventh cause of action alleges that NuVasive has been unjustly

16  enriched because it is profiting from the sale of its products by MMI's former

17  employees within MMI's former territory.   NuVasive moves for summary

18  judgment on this claim on the ground that the ESR Agreement expressly allowed

19  NuVasive to terminate the agreement and, upon payment of the Stated

20  Percentage, to solicit and hire MMI's employees.  However, as discussed above,

the evidence in the record does not support NuVasive's interpretation of the contract.  Therefore, NuVasive's motion is denied as to MMI's unjust enrichment claim.

7.  Limitation of Damages

NuVasive requests a ruling that MMI's damages, if any, are limited to the term of the ESR Agreement — i.e., through 2013.  Citing to Martin v. U-Haul, 204 Cal. App. 3d 396, 409 (1988), NuVasive argues that recoverable damages are limited to those foreseeable by the parties at the time of contracting, and that awarding damages beyond the term of the ESR Agreement would put MMI in a better position than if both parties had performed in accordance with the contract.

Martin is inapposite because it concerns damages for breach of contract. Here, MMI seeks damages for tortious conduct.  "The measure of damages for intentional interference with contractual relations or prospective economic advantage is 'an amount that will reasonably compensate plaintiff for all loss or harm, providing that you find it was [or will be] suffered by plaintiff and caused by the defendant's conduct.'"  Sole Energy Co. v. Petrominerals Corp., 26 Cal. App. 4th 212, 232 (2005) (quoting BAJI No. 7.89).  See also Korea Supply, 29 Cal. 4th at 1165 (explaining that the plaintiff, who claimed that but for the defendant's interference plaintiff would have been awarded contract, sufficiently satisfied the

requirement that the economic harm it suffered was proximately caused by the acts of the defendant).

There is a genuine issue of material fact regarding whether the ESR Agreement would have been renewed for an additional three years or another time period.  There is evidence that specialized knowledge was needed to be a sales person for NuVasive's products and that it would take at least a year to properly train a sales person.  (Moore Dep. (Ex. 17 to Huang Decl.) at 219:6-23.)  Furthermore, continuity of sales personnel was important because individual sales representatives developed relationships with surgeons and built up trust and credibility.  (Id. at 220:6-12.)   Given this information, it is possible that without the option of hiring MMI's sales personnel, NuVasive would have extended its relationship with MMI beyond 2013.[4]  NuVasive's motion is denied as to this issue.

## III.  CONCLUSION

For the reasons discussed above, Defendants' motion for partial summary judgment [Doc. 92] is **GRANTED IN PART** and **DENIED IN PART**.  The Court

---

[4] The evidence offered by MMI regarding other distributors who failed to meet quota and were not terminated is not persuasive evidence that NuVasive would have *renewed* the ESR Agreement.  There is no evidence regarding the terms governing the agreements between NuVasive and these other distributors.  Furthermore, a decision not to renew would not necessarily be based solely on sales performance but could also take into account NuVasive's assessment regarding the health and future of MMI.

grants Defendants' motion as to NuVasive's first, second, and third causes of action to the extent that they are based on allegedly missing sets, NuVasive's sixth cause of action to the extent it is based on alleged threats and disparagement by Defendants, as well as Nuvasive's seventh, eighth, ninth, and tenth causes of action.   Defendants' motion for partial summary judgment is otherwise denied.

NuVasive's motion for partial summary judgment [Doc. 98] is also **GRANTED IN PART** and **DENIED IN PART**.   NuVasive's motion is **GRANTED** as to MMI's second cause of action for breach of contract and sixth cause of action for breach of the implied covenant of good faith and fair dealing. NuVasive's motion is otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated:  July 20, 2015

Barry Ted Moskowitz, Chief Judge
United States District Court

36