UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NUVASIVE, INC., a Delaware corporation,<br><br>       Plaintiff,<br><br> v.<br><br>MADSEN MEDICAL, INC., a Nevada corporation; KRIS MADSEN, an individual residing in Nevada; and DOES 1-10, inclusive,<br><br>       Defendants.<br><br>MADSEN MEDICAL, INC., a Nevada corporation,<br><br>       Counterclaimant,<br><br> v.<br><br>NUVASIVE, INC., a Delaware corporation,<br><br>       Counterdefendant. | Case No.: 13cv2077 BTM(RBB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MMI'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND DENYING NUVASIVE'S MOTION FOR JUDGMENT AS A MATTER OF LAW** |

  Counterclaimant Madsen Medical, Inc. ("MMI") and Counterdefendant NuVasive, Inc. ("NuVasive") have filed Motions for Judgment as a Matter of Law under Fed. R. Civ. P. 50(a). For the reasons set forth below, the Court **GRANTS IN PART** MMI's motion as it relates to interpretation of relevant provisions of the Exclusive Sales Representative Agreement. For the reasons set forth on the record, MMI's motion is otherwise **DENIED**, and NuVasive's motion is **DENIED**.

## I. BACKGROUND

A. <u>Pertinent Provisions of the ESR Agreement</u>

The Exclusive Sales Representative Agreement ("ESR Agreement") (Trial Ex. 548) provides that it will remain in effect for three years unless terminated earlier as allowed under the agreement.  Section 11 of the Agreement sets forth the circumstances under which the ESR Agreement can be terminated.

Section 11.5(d) provides:

> If NuVasive should terminate this Agreement due to a material breach by Representative of any of their obligations under Section 2.4, 6.13, 6.15, 9 or 10 of this Agreement, then in addition to any other legal or equitable remedies available to NuVasive, NuVasive shall have the right in its sole discretion and for no additional consideration to Representative:  to direct Representative to immediately assign to NuVasive all Compliance Agreements or similar agreements described in Section  6.13 above; and to solicit, contract with, or hire any sales representatives of Representative.

NuVasive's stated reason for terminating the Agreement was not for breach of MMI's obligations under § 2.4 (conflicts of interest), § 6.13 (agreement regarding competitive products and non-solicitation), § 6.15 (interaction with health care professionals), § 9 (trademarks), or § 10 (confidentiality).  Rather, NuVasive terminated MMI under § 11.3 for being in "Poor Standing."

Section 11.3 provides:  "NuVasive shall have the right to terminate this Agreement at will if Representative is deemed to be in 'Poor Standing' per Section 6.1. . . ."  As defined in § 6.1, "Poor Standing" occurs when (1) MMI fails to secure orders for 95% of its aggregate Quota Commitment in any two consecutive calendar quarters, or (2) fails to secure orders for 95% of its aggregate Quota Commitment for any given year.

Section 11.3 further provides that if NuVasive chooses to terminate the Agreement for "Poor Standing," NuVasive may choose to exercise "the termination right" described in §11.6.  Under § 11.7, upon full payment of the "Stated

Percentage," as set forth in § 11.6, NuVasive obtains the following:

> Additional Provisions Regarding Change of Control.  In the event the Second payment is made, all Compliance Agreements (or similar agreements then in effect) shall be immediately assigned to NuVasive or the Acquiring Party (at NuVasive's discretion) and all other reasonable steps (not to include significant cash payments by Representative) shall be taken by Representative to ensure that the services of all Representative Affiliates are continued uninterrupted on behalf of the Acquiring Party of NuVasive (as appropriate).  *Further, NuVasive may at any time Representative is in Poor Standing, upon payment of the Stated Percentage, elect to terminate this Agreement and have all Compliance Agreements assigned to it (and require that all other reasonable steps (not to include significant cash payments by Representative) be taken by Representative to ensure that the services of all Representative Affiliates are continued uninterrupted on behalf of NuVasive).*

(Emphasis added.)

The Compliance Agreements are described in § 6.13 of the Agreement. Section 6.13 provides:

> During the Term and for a period of one (1) year following the expiration or termination hereof, neither Representative nor any of Representatives' partners, employees, sub-contractors, sales personnel (whether employees of Representative or independent contractors), affiliates or agents (nor any entity in which Representative has an ownership interest) (each a "representative Affiliate") shall (i) develop, represent, promote or otherwise try to sell within the Territory any lines or products that, in the Company's reasonable judgment, compete with the Products covered by this Agreement, (ii) solicit (directly or indirectly) any current or former customers of NuVasive to purchase any products or lines that are, in the Company's reasonable judgment, competitive with the Products covered by this Agreement, or (iii) solicit or offer work to, directly or indirectly, any of NuVasive's employees, agents or representatives.  Representative represents and warrants that (A) each Representative Affiliate engaged by it on the date of execution hereof has executed an agreement (a "Compliance Agreement") in form and substance sufficient to contractually obligate such person or entity to comply with the restrictions contained in this Section 6.13, (B) each person or entity

>who becomes a Representative Affiliate in the future shall execute a Compliance Agreement prior to performing any services for the benefit of NuVasive, (C) each Compliance Agreement will name NuVasive as an intended third party beneficiary with full right to directly enforce provisions necessary to comply with this Section 6.13 and (d) [sic] it will vigorously enforce the restrictions contained in this Section 6.13 and each Compliance Agreement at its own cost (and in the event Representative fails to adequately enforce such restrictions, NuVasive may do so at Representative's cost).

Section 6.13 also provides that each Compliance Agreement shall require all sales representatives to comply with the terms of § 6.10 (requiring compliance with laws and policies) and § 6.12 (regulatory compliance), and that MMI shall provide NuVasive a copy of each Compliance Agreement.

B.  <u>Pertinent Provisions of MMI's Employment Agreement and Independent Contractor Agreement</u>

MMI did not enter into a separate "Compliance Agreement" with any of its sales people. Instead, MMI incorporated the requirements of § 6.13 into its employment agreements and independent contractor agreements.

MMI's form Employment Agreement (Trial Ex. 46) and Independent Contractor Agreement (Trial Ex. 1) are substantially similar. Both agreements include a non-competition provision as well as a non-solicitation and noninterference provision. The non-competition provision (§ 5.4) provides, in pertinent part:

>Employee acknowledges that the sale and distribution of medical products such as or similar to the Medical Products handled by MMI, is a highly competitive field and is largely dependent on the good will that a business such as MMI has created with its customers. Thus, Employee stipulates and agrees that it is reasonable to restrict Employee's ability to compete with MMI in this field not only during Employee's employment but also for a reasonable period following Employee's employment with MMI. Therefore, during the Employment Term and for twelve (12) months following the Employment Term,

Employee shall not, in any manner, directly or indirectly (through one or more affiliates or otherwise), sell Competitive Products or otherwise engage or participate in any business that is in competition with the business of MMI in (a) the Assigned Territory, or (b) in any other locale in which Employee conducted business activities on behalf of MMI at any time during the twelve (12) months preceding the termination of Employee's employment with MMI.  For purposes of this Section, "Competitive Products" means any goods, products or product lines that are directly or indirectly competitive with the Medical Products sold by MMI, including without limitation NuVasive Products.

The non-solicitation and noninterference provision (§ 5.5) provides:

For twelve (12) months following the Employment Term, Employee shall not, directly or indirectly (through one or more affiliates or otherwise), canvas, solicit, or accept any business or patronage from any Customer or prospective Customer of MMI or any person who or which is an affiliate of any Customer or prospective Customer of MMI, such as an affiliated hospital, clinic or healthcare facility, a member of a physician group, an affiliate of a healthcare provider or otherwise. Employee understands that, and Employee hereby confirms Employee's understanding that, under the law, Employee is not permitted to improperly interfere with MMI's contractual rights or business expectancies.  Without limiting Employee's legal obligation in this regard, Employee agrees that, during the Employment Term and for twelve (12) months following Employment Term, Employee shall not induce or attempt to induce, or assist any other person to induce or attempt to induce (i) any Customer or prospective Customer of MMI to discontinue or limit its relationship with MMI; (ii) any vendor or supplier of MMI (including NuVasive) to discontinue or limit its relationship with MMI; or (iii) any employee or salesperson of MMI to discontinue or limit its employment or independent contractor relationship with MMI.[1]

Both agreements also include a provision that requires employees to comply with all applicable federal, state and local laws, regulations and ordinances (§ 4.4)

---

[1] The Court has quoted the language in § 5.4 and § 5.5 of the Employment Agreement. The language in the Independent Contractor Agreement is almost identical except the word "salesperson" is used in lieu of "employee."

and a "Third Party Beneficiary" provision (§ 8.11), which provides:

> Section 4.4 and Article V of this Agreement are for the benefit of not only MMI but also NuVasive and, without limiting MMI's right, in any way, NuVasive shall have the right, power and authority to enforce such provisions as though it were a party hereto. As such, NuVasive is an express third party beneficiary to this Agreement.

C. <u>Court's Pretrial Rulings</u>

In the Court's Order Granting in Part and Denying in Part Cross-Motions for Summary Judgment ("MSJ Order") [Doc. 163], the Court granted summary judgment in favor of NuVasive on MMI's claim that NuVasive breached the ESR Agreement by soliciting and hiring MMI's employees. The Court found that based on the record before it, there was no basis for implying in the ESR Agreement either a prohibition against the solicitation and hiring of MMI employees under the circumstances of this case or an authorization to do the same.

With respect to NuVasive's argument that § 11.7 authorized it to hire MMI's employees, the Court explained:

> NuVasive argues that § 11.7 must be read as allowing NuVasive to solicit and hire MMI employees upon payment of the Stated Percentage because NuVasive already has the right to enforce the Compliance Agreements as an intended third-party beneficiary. NuVasive reasons that it would be nonsensical for it to pay over $1.7 million to obtain rights that it already has. However, it is possible that the parties believed that assignment of the Compliance Agreements would confer some additional benefit on NuVasive. In addition, it appears that upon payment of the Stated Percentage, NuVasive obtained the right to require MMI to take steps to ensure that the services of MMI's sales personnel continued uninterrupted. It is unclear what uninterrupted services means in the context of termination – i.e., whether sales representatives must fulfill outstanding contracts, cooperate in transferring business to a new Representative, and/or do something else. But it seems that NuVasive obtained some sort of benefit that it would not otherwise have had if it terminated MMI without payment of the Stated Percentage. Whether the benefit is worth $1.7 million is not for the Court to say. See <u>Frankel v. Board of</u>

> Dental Examiners, 46 Cal. App. 4th 534, 545 (1996) ("It is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate unjustly.  Parties have the right to make such agreements.")

(MSJ Order at 24:8-25:6.)

Before trial, the Court denied motions in limine brought by MMI to exclude evidence and argument regarding § 11.7 and the Stated Percentage payment. The Court explained that although it had ruled previously *that based on the record before it*, it could not interpret the contract to permit solicitation and hiring of MMI's employee, the contract was ambiguous and the parties would be allowed to present extrinsic evidence regarding the meaning of § 11.7.

D. Evidence Presented at Trial

At trial, the only witness who offered any significant testimony about the formation of the ESR Agreement was Jason Hannon, formerly NuVasive's general counsel.  According to Hannon, prior to the ESR agreement being executed, Hannon spoke with each of the distributors, including Kris Madsen,  about the key changes in the agreement, including the addition of the following language in §11.7:

> Further, NuVasive may at any time Representative is in Poor Standing, upon payment of the Stated Percentage, elect to terminate this Agreement and have all Compliance Agreements assigned to it (and require that all other reasonable steps (not to include significant cash payments by Representative) be taken by Representative to ensure that the services of all Representative Affiliates are continued uninterrupted on behalf of NuVasive).

(Trial Tr. Vol. 4A at 475:11-24; 478:3-23; 484:6-18.)

Hannon recalls that Ms. Madsen and/or her lawyer made comments regarding how NuVasive could reduce the sales territory under the agreement, what financial security there was for MMI, what would happen in the event of a

change of control of NuVasive, and under what circumstances and how NuVasive could terminate the distributorship under the contract. (Id. at 480:1-6.) In proceedings outside of the presence of the jury, Hannon said that he did not conduct a line-by-line review of the contract with the distributors, but, rather, provided a "high-level explanation to provide context for the contract." (Trial Tr. Vol. 4B at 514:-13-15.)  Mr. Hannon believes that the discussion of the change in § 11.7 "would have been wrapped up in the larger changes around removing of territory, change of control, and NuVasive taking territory direct." (Id. at 513:25-514:2.)

On cross-examination, Hannon conceded that comparing the 2008 version of the ESR Agreement and the 2011 version, there actually was no change in § 11.7. (Id. at 573:7-12.) "My memory is clearly off that this changed from the 2008 agreement . . . ." (Id. at 573:18-19.)

Testifying about the purpose of § 11.7, Hannon explained: "This says if representative is ever in poor standing, we can make a payment equal to the stated percentage along with terminating the agreement, and all of the compliance agreements would be assigned to us, the compliance agreements just being the agreements between Madsen Medical and its employees or representatives." (Id. at 532:5-10.) Hannon described the compliance agreements as follows:

> The compliance agreement is the agreement that the distributorship signs with its employee or representative that reflects the same basic terms that are in this agreement between NuVasive and the distributor. The primary thing being the noncompete provisions that are in this agreement are passed down to the individuals through the compliance agreements that each of them signed with the distributorship . . . . We thought we were buying all the compliance agreements being assigned over to us and cooperation, meaning all reasonable steps to make sure that the people who worked for Madsen Medical would continue working uninterrupted on behalf of NuVasive.

(Id. at 535:2-9,14-18.)

E. <u>The Court's Interpretation of § 11.7</u>

After the close of evidence at trial, the Court determined that there was no disputed extrinsic evidence regarding the meaning of § 11.7 of the ESR Agreement, and that it was for the Court to interpret § 11.7 as a matter of law. The Court gave the jury the following instruction (Court's Instruction No. 19):

> UNDER SECTION 11.3 OF THE ESR AGREEMENT, NUVASIVE HAD THE RIGHT TO TERMINATE THE AGREEMENT AT WILL IF MMI WAS IN "POOR STANDING," AS DEFINED IN SECTION 6.1 OF THE AGREEMENT.
> UNDER SECTION 11.7, IF MMI WAS IN POOR STANDING, NUVASIVE COULD PAY A "STATED PERCENTAGE" AND ELECT TO TERMINATE THE AGREEMENT AND (1) HAVE ALL COMPLIANCE AGREEMENTS ASSIGNED TO IT; AND (2) REQUIRE MMI TO TAKE REASONABLE STEPS TO ENSURE THAT THE SERVICES OF ALL OF MMI'S SALES REPRESENTATIVES CONTINUE UNINTERRUPTED ON BEHALF OF NUVASIVE.
> WHEN A PARTY TO A CONTRACT ("ASSIGNOR") ASSIGNS ITS RIGHTS TO SOMEONE ELSE ("ASSIGNEE"), THE ASSIGNEE OBTAINS ALL OF THE RIGHTS UNDER THE CONTRACT PREVIOUSLY POSSESSED BY THE ASSIGNOR.
> PAYMENT OF THE STATED PERCENTAGE TO MMI RESULTED IN THE ASSIGNMENT OF THE COMPLIANCE AGREEMENTS TO NUVASIVE. THE COMPLIANCE AGREEMENTS CONSIST ONLY OF THE PROMISES OF MMI'S EMPLOYEES (1) NOT TO COMPETE WITH NUVASIVE WITHIN THE SALES TERRITORY DURING THE EMPLOYMENT TERM AND FOR TWELVE MONTHS AFTER; (2) NOT TO SOLICIT ANY CURRENT OR FORMER CUSTOMERS OF NUVASIVE DURING THE EMPLOYMENT TERM AND FOR TWELVE MONTHS AFTER; AND (3) TO COMPLY WITH ALL APPLICABLE FEDERAL, STATE AND LOCAL LAWS.
> ASSIGNMENT OF THE COMPLIANCE AGREEMENTS DID NOT RESULT IN THE ASSIGNMENT OF THE AGREEMENTS MADE BY MMI'S EMPLOYEES THAT THEY WOULD NOT, DURING THEIR EMPLOYMENT TERM AND FOR TWELVE MONTHS AFTER, COMPETE AGAINST MMI, SOLICIT MMI'S CUSTOMERS OR PROSPECTIVE CUSTOMERS, OR INTERFERE WITH MMI'S BUSINESS RELATIONSHIPS.
> SECTION 11.7 NEITHER AUTHORIZES NOR FORBIDS NUVASIVE FROM SOLICITING AND HIRING MMI'S EMPLOYEES TO SELL NUVASIVE PRODUCTS WITHIN THE SALES TERRITORY. HOWEVER, IF, AFTER TERMINATING MMI FOR POOR STANDING, NUVASIVE HIRED MMI'S EMPLOYEES, THE EMPLOYEES WERE STILL BOUND BY THEIR EMPLOYMENT AGREEMENTS WITH MMI.

## II. DISCUSSION

Although the Court briefly explained on the record its reasoning behind its interpretation of the ESR Agreement, the Court provides a more detailed analysis below.

A. <u>Principles of Contract Interpretation</u>

In interpreting a contract, the goal is "to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. The court looks to the objective, outward expression of the contract "rather than a party's unexpressed intention." <u>Winet v. Price</u>, 4 Cal. App. 4th 1159, 1166 (1992). "Undisclosed communications and understandings are not credible extrinsic evidence and may not be used by the Court to determine the parties' mutual intent." <u>SCC Alameda Point LLC v. City of Alameda</u>, 897 F. Supp. 2d 886, 897 (N.D. Cal. 2012).

The court may consider the circumstances under which the contract was made, and the matter to which it relates. Cal. Civ. Code § 1647. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. If uncertainty in a contract is not removed by application of the other rules of interpretation, the language of the contract should be interpreted most strongly against the party who caused the uncertainty to exist. Cal. Civ. Code § 1654.

Extrinsic evidence is admissible to prove a meaning to which a contract is reasonably susceptible. <u>Wolf v. Superior Court</u>, 114 Cal. App. 4th 1343, 1351 (2004). If there is no material conflict in the extrinsic evidence, the court interprets the contract as a matter of law. <u>Wolf v. Walt Disney Pictures and Television</u>, 162 Cal. App. 4th 1107, 1126 (2008). If, however, there is a conflict in the extrinsic evidence, the jury must resolve the factual conflict. <u>Id.</u>

B. <u>Interpretation of the ESR Agreement</u>

There was no material conflict in the extrinsic evidence presented at trial. Therefore, it is proper for the Court to interpret the ESR Agreement as a matter of law.

NuVasive contends that upon payment of the Stated Percentage to MMI, NuVasive was assigned the "Compliance Agreements" between MMI's salespeople and MMI. According to NuVasive, the "Compliance Agreements" consist of the entire Employment Agreement or Independent Contractor Agreement, meaning MMI no longer had the right to enforce the non-competition and non-solicitation/noninterference agreements against its former employees.

In contrast, MMI contends that the "Compliance Agreements" that were assigned to NuVasive consist only of the agreements regarding non-competition and non-solicitation described in § 6.13 of the ESR Agreement – i.e., agreements not to compete with NuVasive or solicit any current of former customers of NuVasive. Thus, the assignment did not affect the rights of MMI to enforce its non-competition and non-solicitation/noninterference agreements against its former employees.

Upon examination of the language of § 6.13, § 11.5(d), and § 11.7 in the context of the entire agreement, the Court agrees with MMI's interpretation. Section 6.13 defines a "Compliance Agreement" as an agreement that "in form and substance" is "sufficient to contractually obligate such person or entity to comply with the restrictions contained in this Section 6.13." There is nothing in § 6.13 that suggests the Compliance Agreement would encompass other contractual duties not described in § 6.13. Although the duties imposed by MMI's non-competition and non-solicitation/noninterference agreements with its employees *overlap* with the duties described in § 6.13 because MMI exclusively distributed NuVasive products (meaning that products competing with MMI would also compete with NuVasive, and MMI's customers were also NuVasive's customers),

the employment agreements and independent contractor agreements also contain provisions that have nothing to do with agreements not to compete with NuVasive. For example, the employment agreements and independent contractor agreements cover employee compensation, resolution of conflicts between employees, and reimbursement of expenses. There is no basis in the language of § 6.13 to conclude that "Compliance Agreement" extends to these provisions or any other obligations not described in § 6.13.

At trial, Jason Hannon testified that he understood that the Compliance Agreement was "the agreement that the distributorship signs with its employee or representative that reflects the same basic terms that are in this agreement between NuVasive and the distributor. The primary thing being the noncompete provisions that are . . . . passed down to the individuals through the compliance agreements that each of them signed with the distributorship. (Trial Tr. Vol. 4B at 535:2-9.) It is unclear from this testimony whether Hannon believed that the Compliance Agreement was the entire employment agreement/independent contractor agreement or just the portions thereof that imposed the duties set forth in § 6.13. To the extent that Hannon believed the former, his belief is of no consequence because there is no evidence that he discussed his understanding with Ms. Madsen or her attorneys. See Headlands Reserve v. Center for Natural Lands Mgmt., 523 F. Supp. 2d 1113, 1128 (C.D. Cal. 2007) (explaining that evidence demonstrating the subjective and undisclosed intent of one party did not reflect the objective mutual intent of the parties and did not control the interpretation of the agreement).

The Court's conclusion that "Compliance Agreement" is limited to the obligations described in § 6.13 is bolstered by an examination and comparison of § 11.5(d) and § 11.7. Section 11.5(d) pertains to a termination of the ESR Agreement by NuVasive due to a material breach by MMI of specified provisions of the Agreement – i.e., § 2.4 (conflicts of interest), § 6.13 (agreement regarding

competitive products and non-solicitation), § 6.15 (interaction with health care professionals), § 9 (trademarks), or § 10 (confidentiality).  If NuVasive terminates the Agreement for material breach of these provisions, "NuVasive shall have the right in its sole discretion and for no additional consideration to Representative:  to direct Representative to immediately assign to NuVasive all Compliance Agreements or similar agreements described in Section 6.13 above; and to solicit, contract with, or hire any sales representatives of Representative."

In contrast, under § 11.7, if MMI is in "Poor Standing," NuVasive may "upon payment of the Stated Percentage, elect to terminate this Agreement and have all Compliance Agreements assigned to it (and require that all other reasonable steps (not to include significant cash payments by Representative) be taken by Representative to ensure that the services of all Representative Affiliates are continued uninterrupted on behalf of NuVasive)."  Significantly, § 11.7 does not include the language found in § 11.5(d), which allows NuVasive to solicit, contract with, or hire any sales representatives of MMI.  Instead, § 11.7 includes the additional language regarding uninterrupted services.

Comparing § 11.5(d) and § 11.7, it appears that the parties intended that NuVasive be allowed to solicit and hire MMI's employees to sell NuVasive products in the instance that MMI breached essential provisions of the contract, but not be permitted to do so in the event of a change of control of NuVasive or "Poor Standing."  This makes sense because material breaches of the provisions specified in § 11.5(d) would likely involve culpable conduct that would justify (1) requiring MMI to forfeit its right to enforce non-competition and non-solicitation clauses against its employees; and (2) permitting NuVasive to hire MMI's sales representatives to continue its business without interruption.

In comparison, in a situation where a distributor is terminated due to a change of control of NuVasive, it can be anticipated that NuVasive's acquirer or successor-in-interest would wish to replace the distributor's sales representatives

with different salespeople of its own choosing, especially if NuVasive is acquired by a company with its own sales representatives in the region. Similarly, if termination is due to "Poor Standing," it is reasonable to expect that NuVasive would want to replace the distributor's sales representatives with new people in an effort to improve performance. In both of these circumstances, the termination would not be due to wrongdoing warranting a sanction against the distributor.

Accordingly, instead of allowing NuVasive to solicit and hire MMI's employees, § 11.7 requires MMI to take reasonable steps to ensure that the services of all sales representatives are continued uninterrupted on behalf of NuVasive. For example, if requested by NuVasive, MMI must allow its sales representatives to continue to provide services to surgeons until new sales representatives are ready to take over.

The Court finds that the use of different language in § 11.7 was purposeful and meaningful. If NuVasive were allowed to just hire MMI's employees (as expressly permitted by § 11.5(d)) upon payment of the Stated Percentage, the uninterrupted services clause would not be necessary. See City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 68 Cal. App. 4th 445, 472 (1999) ("Courts must interpret contractual language in a manner which gives force and effect to every provision, and not in a way which renders some clauses nugatory, inoperative or meaningless.").

NuVasive argues that § 11.7 must be read as allowing NuVasive to solicit and hire MMI employees upon payment of the Stated Percentage because NuVasive already has the right to enforce the Compliance Agreements as an intended third-party beneficiary. However, the rights of a third-party beneficiary are not identical to those of an assignee. For instance, a third-party beneficiary seeking to enforce a contract is subject to the defenses that would be valid as between the contracting parties. Stratosphere Lit. LLC v. Grand Casinos, Inc., 298 F.3d 1137, 1146 (9th Cir. 2002).

For the Stated Percentage, NuVasive obtained (1) the rights of an assignee of the Compliance Agreements and (2) the right to require that MMI take reasonable steps to ensure uninterrupted services on behalf of NuVasive. Accordingly, NuVasive obtained a benefit in exchange for payment of the Stated Percentage. It is not for the Court to decide whether the benefit is worth $1.7 million.

As the Court instructed the jury, the assignment of the Compliance Agreements did not result in the assignment of the agreements made by MMI's employees that they would not, during the term of their employment and for twelve months after, compete against MMI, solicit MMI's customers, or interfere with MMI's business relationships. After NuVasive terminated MMI and hired MMI's employees, the employees were still bound by the non-competition and non-solicitation/noninterference agreements in their employment contracts.

### III. CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** MMI's Motion for Judgment as a Matter of Law [Doc. 278] as it relates to interpretation of relevant provisions of the Exclusive Sales Representative Agreement. For the reasons set forth on the record, MMI's motion is otherwise **DENIED**, and NuVasive's Motion for Judgment as a Matter of Law [Doc. 277] is **DENIED**.

**IT IS SO ORDERED.**

Dated:  March 2, 2016

*/s/ Barry Ted Moskowitz*
Barry Ted Moskowitz, Chief Judge
United States District Court