UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NUVASIVE, INC., a Delaware corporation,<br><br>                                    Plaintiff,<br><br>   v.<br><br>MADSEN MEDICAL, INC., a Nevada corporation; KRIS MADSEN, an individual residing in Nevada; and DOES 1-10, inclusive,<br><br>                              Defendants.<br><br>———————————————<br><br>MADSEN MEDICAL, INC., a Nevada corporation,<br><br>                          Counterclaimant,<br><br>   v.<br><br>NUVASIVE, INC., a Delaware corporation,<br><br>                       Counterdefendant. | Case No.:  13cv2077 BTM(RBB)<br><br>**ORDER DENYING SUPPLEMENTAL MOTION FOR JUDGMENT AS A MATTER OF LAW RE: DAMAGES AND MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL** |

        Counterdefendant NuVasive, Inc. ("NuVasive") has filed a Supplemental Motion for Judgment as a Matter of Law re: Damages as well as a Renewed Motion for Judgment as a Matter of Law, or in the Alternative, New Trial.  For the reasons set forth below, the Court **DENIES** NuVasive's motions.

# I. **STANDARD**

A motion for judgment as a matter of law under Rule 50(a) or a renewed motion for judgment as a matter of law under Rule 50(b) can be granted only if "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002). The jury's award must be upheld if there was any "legally sufficient basis" to support it. Costa v. Desert Palace, Inc., 299 F.3d 838, 859 (9th Cir. 2002). In deciding a motion for judgment as a matter of law, the court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Instead, the court must "draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe." Harper v. City of Los Angeles, 533 F.3d 1010, 1021 (9th Cir. 2008).

The district court may grant a new trial under Rule 59 "if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (quoting Passantino v. Johnson & Johnson Consumer Prods., 212 F.3d 493, 510 n. 15 (9th Cir. 2000)). In deciding a Rule 59 motion, the district court is not required to view the trial evidence in the light most favorable to the verdict, but may, instead, weigh the evidence and assess the credibility of the witnesses. Experience Hendrix LLC v. Hendrixlicensing.com Ltd., 762 F.3d 829, 842 (9th Cir. 2014).

//
//
//
//
//

13cv2077 BTM(RBB)

# II. DISCUSSION

A. Supplemental Motion for Judgment as a Matter of Law re: Damages

In its Supplemental Motion, NuVasive argues that (1) MMI is not entitled to unjust enrichment or disgorgement on its intentional interference tort claims; and (2) the jury's lost profits award was not supported by the evidence.

After NuVasive filed its Supplemental Motion, the Court entered judgment [Doc. 319] in the case.  The Court included in the judgment the $7.5 million in damages awarded by the jury but did not include the $14 million in disgorgement awarded by the jury on MMI's unjust enrichment claim.  Therefore, NuVasive's argument regarding the unavailability of an unjust enrichment remedy is moot.[1]

NuVasive challenges the lost profits award on several grounds.  Nuvasive argues: (1) because NuVasive was within its rights in terminating the ESR Agreement, MMI's damages on its tort claims are limited to profits it lost when it lost the services of Matt Smith, Frank Orlando, and Steve Kordonwy; (2) MMI was required to establish profits these particular employees would have generated through January 1, 2014, selling products *other* than NuVasive products or other spine products; and (3)  Elaine White, MMI's damages expert, relied on assumptions not supported by the evidence.  None of these arguments supports the granting of judgment as a matter of law.

1. Evidence that ESR Agreement Would Not Have Been Terminated

Although NuVasive was within its contractual rights in terminating the ESR Agreement, there was sufficient evidence for the jury to conclude that absent

---

[1] In its reply brief, NuVasive argues that evidence regarding the unjust enrichment claim "tainted the entire proceeding." (Reply at 3:18-19.)  In its Renewed Motion for Judgment as a Matter of Law and Motion for New Trial, NuVasive repeats this argument and makes additional arguments regarding why judgment as a matter of law should be granted on MMI's unjust enrichment claim and/or why a new trial should be granted.  The Court addresses these arguments in its discussion on the Renewed Motion and Motion for New Trial.

assurances that Smith, Orlando, and Kordonowy would breach their employment agreements with MMI—by working for NuVasive, competing against MMI, and selling to MMI's customers—NuVasive would not have terminated the ESR Agreement.  Several NuVasive representatives testified about the importance of keeping the sales team in place so that customers would not be lost to competitors. For example, Jason Hannon testified that NuVasive did not want any gap in coverage in Las Vegas, even for one day, because the MMI sales team had relationships with the surgeons they worked for and knew the products well.  (Trial. Tr. Vol. 5A at 604:8-605:6.)  Jeff Moore testified that NuVasive was at risk of losing the entire team, "which would have had disastrous effects to not only NuVasive, the Madsen Medical organization, but also customers that we serve, and patients." (Trial Tr. Vol. 9A at 1388:23-1389:2.)  Jeff Rydin explained that it would not be easy to bring on new sales representatives and put them in hospitals where they aren't familiar with the surgeons and their unique requirements.  (Trial Tr. Vol. 11A at 1759:19-23.)   Rydin testified, "Unhappy surgeon customers have other salespeople.  It's a highly competitive sales environment.  There's a lot of other people ready to take your business."  (Id. at 1759:25-1760:2.)

Furthermore, the actions and statements of NuVasive employees in 2012 can be viewed as confirming that NuVasive's priority was to keep the MMI sales team intact.  In an email dated July 11, 2012, Ed Graubart told Jeff Moore:

> There are significant turnover risks that will affect our business short and long term if we don't do something immediately.  If we don't respond in a timely manner and lose the reps, Vegas will go backwards quickly and it will take monumental effort and time to bring it back.  Too many good things have happened with the group that is there and I believe this is the group we need to protect.

(Trial Ex. 12 (Ex. B to Ybarra Decl.).)  In an email dated August 8, 2012, Moore outlined two possible scenarios for the "transition of Las Vegas and Reno from Madsen Medical."  (Trial Ex. 13 (Ex. C to Ybarra Decl.).)  Both plans involved

13cv2077 BTM(RBB)

retaining "all current A players."  (Id.)

There was also evidence supporting an inference that prior to MMI's termination, NuVasive communicated its plan to hire the MMI sales representatives to at least Smith, Orlando, and Kordonowy.  On July 9, 2012, Smith sent Moore copies of his and Kordonowy's compensation agreements with MMI.  (Trial Exs. 28, 29 (Exs. H, I to Ybarra Decl.).)  On August 8, 2012, Jeff Moore had a "planning" call scheduled with Matt Smith, Frank Orlando, and Steve Kordonwy.  (Trial Ex. 380 (Ex. K to Ybarra Decl.).)  Draft offer letters to the MMI sales representatives were ready by August 17, 2012.  (Trial Ex. 16 (Ex. D to Ybarra Decl.).)

Accordingly, there was sufficient evidence for the jury to find that (1) NuVasive's intentional interference with the sales representative's contracts[2] was an essential component of the plan to terminate the ESR and take over MMI's customers; and (2) NuVasive never would have terminated the ESR absent successful interference.  In other words, there was a legally sufficient basis for the jury to conclude that NuVasive's intentional interference with the sales representatives' contracts caused the termination of the ESR Agreement.

Consequently, MMI's loss of profits from the termination of the ESR Agreement is the proper measure of damages.  MMI is not limited to losses caused by the lost services of Smith, Orlando, and Kordonowy only,[3] and MMI does not

---

[2] The interference consisted of inducing the sales representatives to breach their promises (1) not to compete with MMI in the assigned territory; (2) not to induce any customer or prospective customer of MMI to discontinue or limit its relationship with MMI; and (3) not to induce or assist any other person to induce any vendor or supplier of MMI (including NuVasive) to discontinue or limit its employment or independent contractor relationship with MMI. Although the sales representatives did not actually compete against MMI until after the ESR Agreement was terminated, prior to the termination, NuVasive had assurances that the sales representatives would compete, and the evidence supports the conclusion that NuVasive terminated the ESR Agreement based on the guaranteed breach of the non-competition clauses. Furthermore, the jury could have found that prior to the termination, NuVasive encouraged MMI sales representatives to breach their non-solicitation and noninterference agreements by participating in the scheme to sever NuVasive's relationship with MMI.

[3] NuVasive argues that MMI cannot base its damages on the efforts of its entire sales

have to prove damages based on the assumption that MMI and its sales representatives would not be able to sell NuVasive or other spine products for one year.

## 2. Supported Assumptions of Elaine White

NuVasive argues that even if lost profits flowing from the termination of the ESR Agreement is the proper measure of damages, Elaine White relied on assumptions not supported by the evidence. Specifically, NuVasive argues that (1) NuVasive would not have renewed the ESR for another term (until the end of 2016); (2) Smith, Orlando, Kordonowy would have quit MMI regardless of anything NuVasive did; and (3) MMI's business was failing, not growing.

### a. Renewal of ESR Agreement

There was evidence from which the jury could find that NuVasive would have renewed the ESR Agreement for another three-year term. As already discussed above, there was testimony regarding how important it was to keep the same sales representatives in place to keep customers happy. There was also evidence that because of the nature of NuVasive's products, a high level of training and

_____

force because there was no evidence regarding NuVasive's interference with MMI's employment agreements with the other employees. Even if there was sufficient evidence only as to the contracts of Smith, Kordonwy, and Orlando, the jury could conclude that these were the key sales representatives and that if it weren't for these men breaching their agreements with MMI, NuVasive would not have terminated the ESR Agreement. Under this scenario, the lost profits at issue would be all of MMI's lost profits in connection with termination of the ESR Agreement, not just profits that would have been generated by Smith, Kordonwy, and Orlando. Moreover, Kris Madsen testified that MMI had written employment contracts with all of its sales representatives and that the contracts were "substantially similar" and generally of the same form. (Trial Tr. Vol. 7A at 918:8-11, 921:7-10.) She also testified regarding the importance of the non-competition and non-solicitation provisions in the contracts. (Id. at 919:15-921:6.) Furthermore, a comparison of Smith's, Kordonowy's, and Orlando's contracts confirms that the agreements were substantially similar, particularly as to the non-competition and non-solicitation clauses.

knowledge was necessary.  Kris Madsen explained that it was very difficult to find qualified sales representatives:

> Because spine is a very difficult thing to grasp.  You have to grasp – I mean the entire body basically, and you have to understand what the products are used for, how they are used, all the biomechanics about them.  You have to understand all of the tools and equipment that are to be used intraoperatively, and it's just very, very time intensive.  It's very difficult to learn.

(Trial Tr. Vol. 7A at 916:18-24.)  Because it was so difficult to find qualified sales people, MMI hired Steve Kordonowy away from Medtronic, a competitor, and paid him to sit out his noncompetition agreement for a year.  (Id. at 929:9-18.)  Terry Rich of NuVasive told Kris Madsen that he knew MMI could make the investments in Reno that NuVasive couldn't – that MMI could afford to pay someone to sit out for a year when NuVasive would never do that.  (Id. at 930:9-13.)

In addition, NuVasive had renewed MMI's contract twice before.  (Id. at 924:20-925:5.)   In 2011, NuVasive awarded MMI the new territory of Reno/ Northern Nevada even though it was rare for new geography to be awarded to a distributor.  (Id. at 928:4-7.)  Ed Graubart testified that of the six distributors he oversaw after March 2012, distributors other than MMI missed quota for periods of time.  (Trial Tr. Vol. 9A at 1453:17-20.)  However, MMI was the only one who was terminated.  (Id. at 1453:21-24.)

NuVasive did not present any evidence that it could have come up with an alternate plan that did not involve buying out MMI (as it unsuccessfully tried to do in 2012) or hiring MMI's sales force away.  There was no evidence that NuVasive had access to other qualified sales representatives who were not subject to a noncompetition agreement and who could step into the shoes of the MMI sales force.

In its reply brief, NuVasive makes the new argument that it is entitled to judgment as a matter of law because the court did not specifically ask the jury to

decide whether NuVasive would not have terminated the ESR absent the ability to hire Smith, Kordonowy, and Orlando. NuVasive points to Jury Instruction No. 27, which explained, "The specific damages claimed by MMI are the lost profits that MMI would have earned had the ESR not been terminated." NuVasive contends that "the Court not only failed to ask the jury to *decide* the merits of MMI's hypothesis that NuVasive would have maintained and then renewed its relationship with MMI but for the acts the jury deemed tortious, it completely removed their ability even to *consider* it." (Reply at 9:10-13.) NuVasive is wrong.

Although the Court explained what damages MMI was claiming, the Court did not instruct the jury that it had to award those damages. In fact, in Jury Instruction No. 28, the Court instructed, "To recover damages for lost profits, MMI must prove it is reasonably certain it would have earned profits but for NuVasive's conduct." Thus, the Court made it clear that there had to be a causal connection between NuVasive's tortious conduct and the lost profits. Moreover, it was clear that MMI's theory of recovery was that NuVasive would not have terminated the ESR agreement and would have renewed it but for NuVasive's tortious interference. During closing arguments, counsel for MMI argued:

> Lost profits. This is the money that Elaine White says, if Madsen Medical was never terminated, it's the money Madsen Medical would have made if it remained as Nuvasive's distributor through 2016. And NuVasive is going to say, oh, that didn't happen. Think about the evidence. Did NuVasive have any other plan other than taking Madsen Medical's employees, right. In fact, they talked about how important it was that they take them immediately. Because of surgeries might get missed, they wouldn't have the relationships with the doctors if we didn't take them. Do you think if they weren't going to terminate – excuse me, if they weren't going to take those people, which they had no right to do, they were actually going to terminate MMI. There is no other evidence of any other plan. That is the only plan they had.

(Trial Tr. 13A at 2127:22-2128:10.)

### b. Continued Employment of Smith, Orlando, and Kordonowy

As for whether Smith, Orlando, and Kordonowy would have quit MMI anyway, the jury was free to give little credit to their statements indicating that they would leave MMI.  During his deposition in 2014, Matt Smith said that he "had no idea" whether he would stay at MMI for the foreseeable future.  (Trial Tr. Vol. 10B at 1631:21-1632:3.)   In June 2012, Smith had resigned from MMI and asked for his job back shortly afterwards. (Trial Tr. Vol. 4A at 486:2-487:18.)     Smith was well-compensated, earning over $400,000 per year.  (Trial Tr. Vol. 10A at 1556:20-24.)  Frank Orlando was also well-paid, earning $25,000-$35,000 per month.  (Trial Tr. Vol. 7A at 914:11-14.)  He testified that if MMI had not been terminated, he "would have gone to work the next day," and "[e]ventually, I probably would have left."  (Trial Tr. Vol. 10B at 1650:2-4.)  When asked whether he would have quit had MMI not been terminated, Kordonowy stated, "I was heading down that path, yes."  (Trial Tr. Vol. 10B at 1691:1.)  But the jury did not have to believe that Kordonowy or any of the others would have left MMI without the security of a job offer from NuVasive.

### c. Growth Projections

NuVasive argues that Ms. White's opinion was based on the unsubstantiated assumption that MMI's business would have grown at an 8.6 % rate between August 2012 and January 2016.  Ms. White presented the jury with five income projection scenarios, three of which utilized the 8.6% compound annual growth rate ("CAGR"), and two of which assumed no growth.  (Trial Tr. Vol. 11A at 1790:21-1791:10.)[4]  The jury could have selected a loss projection based on no

---

[4] The scenarios resulted in lost income calculations ranging from a low of $4,933,857 to a high of $10,171,393.  The average of the five scenarios was $7,384,856 – close to the $7.5 million that was ultimately awarded by the jury.

growth if it felt that the 8.6 CAGR was unsupported.

Ms. White explained that the 8.6% CAGR was based on NuVasive's own growth projections.  (Trial Tr. Vol. 11A at 1793: 11-16.)  She explained that the 8.6% CAGR was actually conservative as compared to the actual growth rate of NuVasive's revenues in the last few months of 2012, 2013, and the first half of 2014.  (Id. at 1793:25-1794:6.)

NuVasive argues that application of the 8.6% CAGR is contrary to the evidence because MMI's "business" significantly declined after 2010.  Although MMI's net income decreased from 2010 to 2011, MMI's sales figures actually increased.  In 2010, MMI's sales were in the area of $18.4 million.  (Trial Tr. Vol. 7A at 906:10-12.)  In 2011, MMI sold $20,091,023.  (Trial Ex. 371 (Ex. M to Ybarra Decl.).)  Although MMI did not meet its quota in 2011, the quota had jumped $5 million from the previous year.  (Trial Tr. Vol. 7A at 926:23-927:12.)  As for 2012, the jury may have determined that it was an anomalous year that did not reflect a trend of decreasing profitability.  Ms. White did not include MMI's 2012 income figures in making her projections because it was an "impacted" year:  "I think with all economic evaluations, you have to evaluate the events of that year to see if they are systematic and consistent and exclude unusual or extraordinary circumstances."  (Trial Tr. Vol. 11A at 1817:1-20.)  Furthermore, Kris Madsen testified that at the end of 2011, MMI lost two customers, Dr. Forage and Dr. Duke. (Trial Tr. Vol. 7A at 931:3-19.)

Drawing all reasonable inferences in favor of MMI, there was a legally sufficient basis for the jury's $7.5 million damage award.  Therefore, the Court denies NuVasive's Supplemental Motion for Judgment as a Matter of Law re: Damages.

B. Renewed Motion for Judgment as a Matter of Law

   1. Unjust Enrichment

NuVasive reasserts its position that unjust enrichment is not an available remedy for intentional interference with contract and argues that it was error for the Court to send the issue of unjust enrichment to the jury. NuVasive further argues that the Court must grant NuVasive judgment as a matter of law on the unjust enrichment claim because the Court did not include the jury's $14 million award in the judgment and is not authorized to reform the jury's decision.

For the reasons set forth in the Court's Order on Pretrial Motions [Doc. 234 at 4:8-6:15], the Court believes that non-restitutionary disgorgement based on the theory of unjust enrichment can be an appropriate remedy for intentional interference with contract. However, an action for unjust enrichment is inappropriate if the plaintiff can obtain full redress for its loss of profits under its action for intentional interference with contract. Ramona Manor Convalescent Hospital v. Care Enter., 177 Cal. App. 3d 1120, 1140 (1986).

Because the jury awarded MMI damages based on its intentional interference with contract claim, the Court determined that MMI was not also entitled to recovery of the jury's disgorgement award. However, it was appropriate to allow the unjust enrichment claim to go to the jury along with the issue of damages for intentional interference to see whether MMI truly had an adequate remedy at law. See, e.g., AIG Retirement Services, Inc. v. Altus Finance S.A., 326 Fed. Appx. 756, 761 (9th Cir. 2010) (unpublished decision) (Fisher, C.J., concurring in part and dissenting in part) (explaining that although under Ramona Manor a claim of equitable restitution does not authorize double recovery, "the bar on double-recovery does not come into play until a party has successfully proven a legal theory at trial.").

It was not error for the Court to not include the disgorgement award in the judgment after the Court had determined that MMI "obtain[ed] full redress for its

loss of profits" on its claim for intentional interference with contract.   It is well established that special verdicts are merely factual findings and do not constitute the law of the case.  Solomon v. United States, 276 F.2d 669, 675 (6th Cir. 1960).  "The manner in which those factual findings are used in formulating and entering the final judgment is a question of law for the Court."  Id. at 676.  See also Thedorf v. Lipsey, 237 F.2d 190, 193 (7th Cir. 1956) ("[I]t is for the court to decide upon the jury's answers, the jury's special verdicts, what the resulting legal obligation is.  In such a situation the jury is not entitled to information concerning the legal principles which the judge will apply to their findings.").[5]

### 2.  Interference with Contract by a Third-Party Beneficiary

NuVasive contends that because NuVasive is a third-party beneficiary to MMI's employment agreements with the sales representatives ("Employment Agreements"), NuVasive cannot be held liable for interference with those contracts.  The Court disagrees.

NuVasive relies on the following language in Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 514 (1994):  "The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance."  Subsequent to Applied Equip., state courts relied on this language to hold that non-contracting

---

[5] NuVasive contends that the Court compounded its error in letting the issue of unjust enrichment proceed to the jury by refusing to admit NuVasive's expert testimony regarding unjust enrichment damages and by refusing to admit the expert report of MMI"s expert in the pending Nevada action. The Court did not commit error in excluding this evidence. As explained by the Court, NuVasive's expert, Mr. Skorheim did not perform an analysis of profits realized by NuVasive in MMI's former sales territory but instead concentrated on the benefit to NuVasive of paying salaries as opposed to commissions. (Trial Tr. Vol. 11B at 1906:3-15.) Elaine White's expert opinion in the Nevada case was excluded because her opinion was governed by Nevada law, as instructed by the attorneys who retained her in that case. (Id. at 1840:4-1841:16.) The Court explained that the probative value for impeachment was nominal, whereas the risk of confusing the jury and causing prejudice was great. (Id. at 1841:2-11.)

parties with legitimate interests in a contract's performance have no tort duty not to interfere with those contracts.  See, e.g., Mintz v. Blue Cross of Cal., 172 Cal. App. 4th 1594, 1603 (2009); Exxon Corp. v. Superior Court, 51 Cal. App. 4th 1672, 1688 (1997);  Kasparian v. Cnty. of Los Angeles, 38 Cal. App. 4th 242, 262 (1995). The Ninth Circuit also described California law as long recognizing "that the core of intentional interference business torts is interference with an economic relationship by a third-party *stranger* to that relationship, so that an entity with a direct interest or involvement in that relationship is not usually liable for harm caused by pursuit of its interests."  Marin Tug & Barge, Inc. v. Westport Petroleum, Inc., 271 F.3d 825, 832 (9th Cir. 2001).

However, recently, "several decisions of the California Court of Appeal have rejected Marin Tug's interpretation of Applied Equip., concluding that Applied Equip. should be limited to its specific holding that only parties to a contract are excluded from asserting an intentional interference claim."  Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1126 (9th Cir. 2014).  The issue before the court in Applied Equip. was whether "a contracting party [may] be held liable in tort for conspiracy to interfere with its own contract."  Id.

In Woods v. Fox Broadcasting Sub., Inc., 129 Cal. App. 4th 344, 352-53 (2005), the California Court of Appeal noted that Applied Equip. used the terms "stranger to a contract" interchangeably with the terms "noncontracting parties" and "third parties," and concluded that the language of Applied Equip. should be construed in light of the facts of that particular case.  Similarly, in Powerhouse Motorsports Group, Inc. v. Yamaha Motor, 221 Cal. App. 4th 867, 883-84 (2014), the California Court of Appeal rejected Yamaha's argument that the holding of Applied Equip. should be extended to nonparties with a "legitimate interest in the scope or course of the contract's performance" who are not "strangers" to the contract.  See also Asahi Kasei Pharma Corp. v. Actelion Ltd., 222 Cal. App. 4th 945, 963 (2013) ("We agree with the Woods court that '[a] stranger,' as used in

Applied Equipment, means one who is not a party to the contract or an agent of a party to the contract.").

Recently, the Ninth Circuit held that Marin Tug does not impose an additional requirement—i.e., that the party be a "stranger" to the contractual relationship with no direct interest or involvement in the relationship—to the tort of intentional interference with contract. United Nat'l Maint., Inc. v. San Diego Convention Ctr., Inc., 766 F.3d 1002, 1007 (9th Cir. 2014). "California courts have repeatedly held that parties with an economic interest in a contractual relationship may be liable for intentional interference with that contract." Id. at 1008. The Ninth Circuit explained that under California law, contractual liability protects contracting parties from the actions of their contractual partners whereas liability for the tort of intentional interference exists to protect parties to a contract from interference from non-parties to the agreement:

> To shield parties with an economic interest in the contract from potential liability would create an undesirable lacuna in the law between the respective domains of tort and contract. A party with an economic interest in a contractual relationship could interfere without risk of facing either tort or contract liability. This result is particularly perverse as it is those parties with some type of economic interest in a contract whom would have the greatest incentive to interfere with it. Such a result would hardly serve the established goal of protecting "a formally cemented economic relationship . . . from interference by a stranger to the agreement." Della Penna, 45 Cal. Rptr. 2d 436, 902 P.2d at 750.

Id. at 1007.

Based on United Nat'l Maint. and the California Court of Appeals decisions limiting the holding of Applied Equip., the Court rejects NuVasive's argument that

it cannot be held liable for intentional interference with contract because it is an express third-party beneficiary to the Employment Agreements.[6]

### 3. Jurisdiction re: Employment Agreements

NuVasive contends that the Court lacked jurisdiction to determine that MMI's Employment Agreements were valid or enforceable.   NuVasive relies on the provision of the Employment Agreements that states:

> **Governing Law; Jurisdiction.**  The laws of the State of Nevada, as such laws have been interpreted and applied by the courts of the State of Nevada, shall govern the validity, performance and enforcement of each and all of the provisions of this Agreement.  Any proceedings with respect to the performance or enforcement of this Agreement must be brought in the state District Court for Clark County, Nevada, which is and shall be, vested with exclusive jurisdiction.

According to NuVasive, under this provision, the Nevada court has exclusive jurisdiction to determine whether the non-competition agreements are enforceable.

NuVasive places too much reliance on this forum selection clause.  It is well-established that a forum selection clause does not deprive a federal court of subject matter jurisdiction.  M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12 (1972).   As explained by the First Circuit, "[S]uch a provision does not oust the

---

[6] NuVasive cites to ViChip Corp. v. Lee, 438 F. Supp. 2d 1087, 1097 (N.D. Cal. 2006) and Nat'l Rural Telecomms. Co-op. v. DIRECTV, Inc., 319 F.  Supp. 2d 1059, 1070-72 (C.D. Cal. 2003), both of which relied on Marin Tug.  NuVasive also cites to PM Group, Inc. v. Stewart, 154 Cal. App. 4th 55 (2007), a case which was distinguished in United Nat'l Maint.:

> In PM Group, Inc. v. Stewart, the California Court of Appeal reiterated that a contracting party could not be tortiously liable for interfering with the performance of its own contract; thus, by extension, a contracting party could not be held liable for interfering with the performance of subcontracts *if that claim hinged on the defendant's failure to perform on the original contract*. 154 Cal. App. 4th 55, 64 Cal. Rptr. 3d 227, 235–36 (2007).

766 F.3d at 1008 (emphasis added).

jurisdiction of the courts; in effect it merely constitutes a stipulation in which the parties join in asking the court to give effect to their agreement by declining to exercise its jurisdiction." <u>LFC Lessors, Inc. v. Pacific Sewer Maint. Corp.</u>, 739 F.2d 4, 6 (1st Cir. 1984).   Here, NuVasive was not even a party to the contracts containing the forum selection clause.   This case does not involve an action to enforce the Employment Agreements against a party to the agreements.   Indeed, those actions are pending before the Nevada state court.

The Court had jurisdiction to interpret the Employment Agreements and determine the validity of the contracts under Nevada law.   Under Nevada law, non-competition provisions are enforceable if the period of time during which the restraint is to last and the territory that is included are reasonable.   <u>See</u> <u>Camco, Inc. v. Baker</u>, 113 Nev. 512 (1997).   In <u>Hansen v. Edwards</u>, 83 Nev. 189 (1967), the court modified a non-competition agreement to extend only to the boundary limits of the City of Reno, where the contract had been performed, and limited the time period of the restraint to one year from the date of the injunction.   "We deem the restriction thus modified to be reasonable."   <u>Id.</u> at 193.   Nevada courts have adopted the view that "[t]o be reasonable, the territorial restriction should be limited to the territory in which appellants [(former employers)] established customer contacts and good will."   <u>Camco</u>, 113 Nev. at 834 (internal quotation and citation omitted).

In this case, the non-competition agreement was limited to the Assigned Territory of MMI and was for a duration of 12 months after the termination of the employment relationship.   Thus, under Nevada law, the non-competition agreement was reasonable and enforceable.


4.  <u>Reformation of Employment Agreements</u>

NuVasive argues that by finding that the "Compliance Agreements" consisted only of the agreements not to compete with NuVasive or solicit any

current or former customers of NuVasive, the Court "severed" these provisions from the rest of the Employment Agreements and unlawfully "reformed" the Employment Agreements.

As pointed out by MMI, NuVasive's unlawful reformation argument is a new argument that was not raised in NuVasive's Rule 50(a) motion for judgment as a matter of law. A party "cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009) (internal quotation and citation omitted).

Even setting aside NuVasive's failure to raise its reformation argument in its Rule 50(a) motion, NuVasive's argument is utterly unpersuasive. The Court did not in any way "reform" the Employment Agreements, which continue to exist as whole instruments. The issue before the Court was the meaning of the term "Compliance Agreement," as used in the ESR Agreement between MMI and NuVasive. Between themselves, MMI and NuVasive were free to define "Compliance Agreement" as all or any part of the Employment Agreements. For the reasons set forth in the Court's Order of March 2, 2016 [Doc. 311 at 11-15], the Court properly determined that "Compliance Agreement" is limited to the obligations described in § 6.13 of the ESR Agreement.


### 5.  Proof of Harm and Unsupported Assumptions of Elaine White

NuVasive argues that none of MMI's tort claims should have gone to the jury because there was no evidence that NuVasive's hiring of the three employees proximately caused MMI any harm. NuVasive also argues that there was insufficient evidence to support the assumptions of Elaine White. These arguments have been fully addressed by the Court in connection with NuVasive's Supplemental Motion for Judgment as a Matter of Law re: Damages.

6. Punitive Damages

NuVasive renews its oral motion for judgment as a matter of law that MMI is not entitled to punitive damages because there was insufficient evidence that NuVasive acted with fraud, malice, or oppression. The Court denies the motion because the Court cannot say that construing the evidence in the light most favorable to MMI, the only reasonable conclusion is that NuVasive did not act with fraud, malice, or oppression.

NuVasive suggests that the Court was "unsure of the proper interpretation of the contract," and argues that if the Court had substantial doubt about whether the ESR Agreement permitted NuVasive to hire the employees after it terminated MMI, a jury could not possibly find that NuVasive acted with the requisite fraud, malice, or oppression. (Mem. of P. & A. at 15:23-16:7.) NuVasive mischaracterizes the Court's handling of the contractual interpretation issue. Before trial, the Court determined that based on the record before it, the ESR Agreement was ambiguous, and allowed the parties to present extrinsic evidence at trial regarding the meaning of § 11.7. NuVasive indicated that it would present extrinsic evidence bearing on the issue. After the close of evidence at trial, the Court determined that there was no disputed extrinsic evidence regarding the meaning of § 11.7, and proceeded to interpret the ESR Agreement as a matter of law. [Doc. 311.] The Court's careful consideration of the evidence and legal issues and adherence to the procedures governing contract interpretation should not be viewed as confusion or uncertainty on the Court's part.

Significantly, there was no evidence before the jury that NuVasive thought that its actions were contractually permissible. During the liability phase of the trial, the Court did not allow NuVasive representatives to testify about their subjective and uncommunicated beliefs regarding the meaning of "Compliance Agreement" and whether payment of the "Stated Percentage" allowed NuVasive to solicit and hire MMI's employees. However, the Court did not place any such restrictions in

the punitive damages phase of the trial.  Nevertheless, NuVasive chose not to put on *any* evidence that its decisionmakers believed that their actions were permitted by the ESR Agreement.

Moreover, there was evidence that could be viewed as showing that NuVasive knew that its actions were wrongful.  The termination letter referred to MMI being in "breach" of the agreement as well as in "Poor Standing," and stated that due to the breaches, NuVasive had a right to demand assignment for no additional consideration of any and all employment or similar agreements with MMI sales representatives.  (Trial Ex. 186.)  Although the termination letter did not cite specifically to § 11.5(d) of the ESR Agreement, it is apparent that NuVasive was referring § 11.5(d), which specifically allowed NuVasive "to solicit, contract with, or hire any sales representatives of Representative."  At trial, however, NuVasive did not take the position that MMI was terminated for breach but instead claimed that MMI was terminated for "Poor Standing" and that the Compliance Agreements were assigned to it upon payment of the Stated Percentage under § 11.7.  The jury could have concluded that NuVasive initially claimed that MMI was in breach, implicating § 11.5(d), because NuVasive realized that it did not have the right to solicit MMI's employees under § 11.7.

Furthermore, based on the evidence, the jury could have reasonably believed that NuVasive was engaged in a secret plot to terminate MMI and hire away MMI sales representatives.  For example, on July 9, 2012, Matt Smith sent Jeff Moore copies of his and Kordonwy's compensation agreement with MMI (Trial Exs. 28, 29.)  At this same time, Moore asked someone at NuVasive for MMI's year-to-date revenue numbers, showing percent to quota, because he was working "on a big project for Madsen."  (Trial Ex. 26.)  At trial, Moore claimed that he did not remember what the "big project" was.  (Trial Tr. Vol. 9A at 1362:14-15, 1365:17-22.)  The jury could have reasonably concluded that NuVasive was acting in a

furtive manner that was inconsistent with a belief that NuVasive's actions were authorized and lawful.[7]

## C. Motion for New Trial

NuVasive raises various grounds in support of its Rule 59 motion for a new trial. None of these grounds warrants a new trial.

NuVasive contends that by allowing the jury to hear evidence regarding NuVasive's unjust enrichment, NuVasive was prejudiced because such evidence potentially impacted not just the amount of damages the jury awarded, but also the jury's view on NuVasive's liability on MMI's tort claims. As already explained above, it was appropriate to allow evidence regarding unjust enrichment as well as economic damages to reach the jury. The jury was clearly instructed regarding the difference between economic damages and disgorgement and separately set forth the awards for both. There is no reason to believe that the jury's economic damage award was impacted at all by the disgorgement award – especially since the damage award was close to the number suggested by Elaine White. There is also no basis for concluding that the evidence pertaining to disgorgement had any bearing on the jury's finding that NuVasive was *liable* for the tort claims—the *same conduct* gave rise to the alternate remedies.

NuVasive places great weight on the following statement by the Court: "[I]f I take the chance and sent it to the jury and I'm wrong, then we need a new trial." (Trial Tr. Vol. 15 at 2276:4-5.) NuVasive takes this statement out of context. The Court made this statement in connection with the *punitive damages* phase of the

---

[7] In a footnote in its moving papers, NuVasive claims that the Court erroneously admitted certain electronic messages between Smith, Orlando, and Kordonowy. NuVasive claims that the messages were highly prejudicial to NuVasive and not probative to any issue before the jury. (Mem. of P. & A. at 16:22-28.) However, NuVasive does not identify which emails it objects to. It is not the Court's job to sift through the exhibits to figure out which emails NuVasive is talking about.

trial.  The Court was expressing its opinion that since it was unlikely that the unjust enrichment award would make it into the final judgment, it was not worth the risk including unjust enrichment as a claim upon which punitive damages could be awarded, especially since the unjust enrichment claim was based on the same predicate acts.  (Id. at 2273:8-13.)  The Court was not commenting upon the inclusion of unjust enrichment in the special verdict.

NuVasive argues that a new trial is warranted because Elaine White calculated the wrong damages and because Ms. White's assumptions were not factually supported. The Court has already addressed these arguments in connection with the Supplemental Motion for Judgment as a Matter of Law re: Damages.

NuVasive also argues that because Ms. White's calculations and assumptions were flawed, the punitive damages are not proportional to legally-permissible lost profits.  Because the Court rejects NuVasive's challenge to Ms. White's calculation of lost profits and the underlying assumptions, NuVasive's argument regarding the proportionality of punitive damages also fails.

NuVasive contends that certain jury instructions were erroneous.  According to NuVasive, the Court improperly instructed the jury that "[t]he specific damages claimed by MMI are the lost profits that MMI would have earned had the ESR not been terminated."  As discussed above, although the Court explained to the jury what damages MMI was claiming, the Court did not instruct the jury that it had to award those damages.  In Jury Instruction No. 28, the Court instructed, "To recover damages for lost profits, MMI must prove it is reasonably certain it would have earned profits but for NuVasive's conduct," making it clear that there had to be a causal connection between NuVasive's tortious conduct and lost profits.  As detailed above, there was sufficient evidence that absent NuVasive's tortious interference with the Employment Agreements, Nuvasive never would have terminated the ESR and would have renewed the ESR for another term.

NuVasive claims that the Court improperly informed the jury that the unjust enrichment award was unlikely to stand.  But NuVasive cites to statements made by the Court *outside of the presence of the jury*.  (Trial Tr. Vol. 15 at 2275:19-2276:10.)   What the Court instructed the jury was, "Disgorgement and damages are alternatives and MMI cannot recover both.  It will be for the court to decide which one MMI can recover after you render your verdict." (Jury Instruction No. 31.)  During closing argument at the punitive damages phase, MMI's counsel told the jury that even though they awarded lost profits and unjust enrichment, MMI would not be awarded both, and that the Court would decide which one MMI would receive.  (Trial Tr. Vol. 15 at 1193:7-18.)  What MMI's counsel said to the jury was consistent with the Court's jury instruction.

NuVasive argues that the Court erred in instructing the jury on punitive damages because it never instructed the jury that Mr. Rydin's belief that his acts were justified under the ESR Agreement bears upon the issue of whether NuVasive acted with the requisite oppression, fraud, or malice.  Notably, NuVasive did not offer any instruction to this effect for the punitive damages phase of the trial.  Furthermore, NuVasive chose not to present any evidence during the punitive damages phase regarding Mr. Rydin's belief that his actions were authorized by contract.  Whether NuVasive's decision not to present such evidence was driven by an unwillingness to waive attorney-client privilege or some other reason, NuVasive made its strategic choice and must live with the consequences.

Finally, NuVasive claims that the Court made additional errors by allowing MMI to offer its subjective interpretation of the ESR as extrinsic evidence while restricting the testimony of Mr. Hannon and Mr. Rydin, and instructing the jury on the meaning of the ESR Agreement.  NuVasive completely distorts the facts.

In keeping with California law, the Court explained to the parties that uncommunicated beliefs of individuals regarding the meaning of contracts is not credible extrinsic evidence that can be considered in determining the mutual intent

of the parties.  See SCC Alameda Point LLC v. City of Alameda, 897 F. Supp. 2d 886, 896 (N.D. Cal. 2012).   But Hannon actually did testify regarding his understanding of § 11.7 and the Compliance Agreements.[8]   The Court did not allow Rydin to testify regarding his belief that payment of the Stated Percentage resulted in NuVasive obtaining the non-competition agreements, because his understanding was based entirely on what Hannon told him, and Rydin had no independent knowledge regarding how the ESR Agreement worked.  (Trial Tr. Vol. 11A at 1773:13-1774:8.)

Kris Madsen did not testify regarding her subjective understanding of what the Compliance Agreements are or the effect of § 11.7.  The testimony cited by NuVasive pertained to her understanding of what "Poor Standing" entailed, what would constitute "material breach" under § 11.5(d), and NuVasive's right to terminate MMI for not making quota.  (Trial Tr. Vol. 5B at 802:21-803:11, Vol. 7A at 904:6-13, 926:02-12.)  These provisions were not in dispute.

For the reasons set forth in the Court's Order of March 2, 2016 [Doc. 311], there was no material conflict in the extrinsic evidence presented at trial regarding the meaning of § 11.7 and "Compliance Agreements."   Therefore, the Court properly interpreted the ESR Agreement as a matter of law and instructed the jury accordingly.

//

//

//

//

---

[8] Jason Hannon testified that he understood that the Compliance Agreement was "the agreement that the distributorship signs with its employee or representative that reflects the same basic terms that are in this agreement between NuVasive and the distributor.  The primary thing being the noncompete provisions that are . . . passed down to the individuals through the compliance agreements that each of them signed with the distributorship.  (Trial Tr. Vol. 4B at 535:2-9.)

## III.  <u>CONCLUSION</u>

For the reasons discussed above, NuVasive's Supplemental Motion for Judgment as a Matter of Law re: Damages [Doc. 313] and NuVasive's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial [Doc. 340] are **DENIED**.

**IT IS SO ORDERED.**

Dated:  June 7, 2016

Barry Ted Moskowitz, Chief Judge
United States District Court

13cv2077 BTM(RBB)